THE STATE EX REL. CINCINNATI ENQUIRER, APPELLANT, *v.* CRAIG, CHIEF,
APPELLEE.

[Cite as *State ex rel. Cincinnati Enquirer v. Craig,*

**132 Ohio St.3d 68, 2012-Ohio-1999.**]

*Public records—R.C. 149.43(A)(1)(v)—Constitutional right of privacy—Personal*
*information identifying police officers who are under threat of criminal*
*retaliation.*

(No. 2011-1798—Submitted April 4, 2012—Decided May 10, 2012.)

APPEAL from the Court of Appeals for Hamilton County,

No. C-100820, 2011-Ohio-4498.

_____

**Per Curiam.**

{¶ 1}  This is an appeal from a judgment denying the claim of appellant, the
Cincinnati Enquirer, for a writ of mandamus to compel appellee, James E. Craig,[1] the
chief of police of the city of Cincinnati, to provide access to certain records pursuant
to R.C. 149.43, the Public Records Act.  Because the requested records are exempt
from disclosure, we affirm the judgment of the court of appeals.

**Facts**

{¶ 2}  The Iron Horsemen is a nationwide outlaw motorcycle gang that has
been based in Cincinnati for about 40 years.  They deal in drugs, weapons, and
prostitution.  In the 1980s, threats and tension between the Iron Horsemen and the
Cincinnati police were prevalent.  One of the members of the Iron Horsemen had
created a 12-gauge shotgun within his motorcycle handlebar to threaten police

_____

1. This case was originally instituted against former Cincinnati police chief Thomas Streicher, who
has since retired.  Craig, who is Streicher's successor, is substituted as the appellee in this appeal.  *See*
*State ex rel. Everhart v. McIntosh*, 115 Ohio St.3d 195, 2007-Ohio-4798, 874 N.E.2d 516, ¶ 6; Civ.R.
25(D)(1); www.cincinnati-oh.gov/police/pages/-5040-/.

officers.  Other members had threatened an officer and his family with weapons at a remote site where he was building a home.  Ultimately, the Iron Horsemen became less confrontational, but the Cincinnati police continued to monitor the gang's activities.

{¶ 3}  Recently, a rival outlaw motorcycle gang, the Detroit Highwaymen, has tried to establish an operations base in Cincinnati, resulting in conflict between the two gangs.  There have been "takeovers" of bars in which members of one of the gangs would enter, close the bar, detain everybody, and determine whether anyone was a rival gang member. They would then threaten and beat rival gang members who were there.

{¶ 4}  On September 18, 2010, an officer on his way to work observed motorcycles outside JD's Honky Tonk bar.  He saw several Iron Horsemen wearing their colors and thought that a takeover of the bar was in progress.  Approximately 14 police officers, including one or two uniformed officers, responded to his call, and a gunfight erupted. Two police officers were wounded, and one of the Iron Horsemen—the group's national enforcer—was killed.  One of the Iron Horsemen pleaded guilty to a weapons charge, but no other charges were filed.

{¶ 5}  Shortly afterward, Thomas Streicher, then Cincinnati police chief, received information that there was a good possibility that Iron Horsemen members would target police—particularly those officers involved in the bar fight—and that the threat of retaliation for the death of the national enforcer could last indefinitely. According to Streicher, based on his "historic knowledge," it is not unusual for an outlaw motorcycle gang to seek revenge against the police when one of its members is shot and killed by the police.  Both officers who had been wounded had themselves returned fire, and both were concerned that if the Iron Horsemen discovered their identities, the gang would retaliate by attacking them or members of their families. One of the two officers wounded had been shot in the right leg by the enforcer, and the bullet had traveled through his leg before becoming lodged in his

hip, where it remains, still causing pain. The other officer had been shot a few inches to the left of his lower spine and still experiences pain at the site of the scar.

{¶ 6} In September and October 2010, reporters for the Cincinnati Enquirer requested that the police department provide the newspaper with certain records related to the September 18, 2010 shootout at JD's Honky Tonk bar, including the names of the two police officers shot, their personnel files, and an unredacted copy of the incident report of the shootout. Streicher denied the requests insofar as the Enquirer sought names and identifying information regarding the officers involved in the shootout:

> We are not releasing the names of any of the officers involved in this incident due to the sensitive nature of their assignments and the sensitive nature of the investigation. I have been meeting with an attorney who represents the national president of the Iron Horsem[e]n Motorcycle Club regarding this incident to try to ensure that no other incidents of violence or retribution will occur as a result of the confrontation at J.D.'s. That being said, it is impossible for any of us to guarantee that any and all individuals will comply with this direction therefore; we are taking all necessary precautions to help protect the lives of any and all police officers; and their families, in the entire region.

{¶ 7} An attorney for the city specified that the city was willing to provide the Enquirer with redacted copies of the requested records.

{¶ 8} On December 22, 2010, the Enquirer filed a complaint in the Court of Appeals for Hamilton County for a writ of mandamus to compel the police chief to make the requested records available for inspection and copying. The Enquirer also sought an award of attorney fees. In its memorandum in support, the Enquirer

admitted that it did not object to certain redactions, including the home addresses of the police officers. The police chief submitted an answer denying the Enquirer's entitlement to the writ, and the parties submitted stipulated evidence, including depositions of Police Chief Streicher, which included portions that were sealed.

{¶ 9} On September 9, 2011, the court of appeals denied the writ and the request for attorney fees.

{¶ 10} This cause is now before the court upon the Enquirer's appeal as of right.

## Legal Analysis

### Mandamus

{¶ 11} "Mandamus is the appropriate remedy to compel compliance with R.C. 149.43, Ohio's Public Records Act." *State ex rel. Physicians Commt. for Responsible Medicine v. Ohio State Univ. Bd. of Trustees*, 108 Ohio St.3d 288, 2006-Ohio-903, 843 N.E.2d 174, ¶ 6; R.C. 149.43(C)(1). "We construe the Public Records Act liberally in favor of broad access and resolve any doubt in favor of disclosure of public records." *State ex rel. Rocker v. Guernsey Cty. Sheriff's Office*, 126 Ohio St.3d 224, 2010-Ohio-3288, 932 N.E.2d 327, ¶ 6.

{¶ 12} "Exceptions to disclosure under the Public Records Act, R.C. 149.43, are strictly construed against the public-records custodian, and the custodian has the burden to establish the applicability of an exception. A custodian does not meet this burden if it has not proven that the requested records fall squarely within the exception." *State ex rel. Cincinnati Enquirer v. Jones-Kelley*, 118 Ohio St.3d 81, 2008-Ohio-1770, 886 N.E.2d 206, paragraph two of the syllabus.

### Constitutional Right of Privacy

{¶ 13} The police chief asserts, and the court of appeals held, that the requested identifying information of the wounded police officers was excepted from disclosure based on the constitutional right of privacy. R.C. 149.43(A)(1)(v) excepts "[r]ecords the release of which is prohibited by state or federal law" from the

4

definition of "public record." "Constitutional privacy rights are 'state or federal law' under R.C. 149.43(A)(1)(v) * * *." *State ex rel. Plain Dealer Publishing Co. v. Cleveland*, 106 Ohio St.3d 70, 2005-Ohio-3807, 831 N.E.2d 987, ¶ 58; *see also State ex rel. Beacon Journal Publishing Co. v. Akron*, 70 Ohio St.3d 605, 640 N.E.2d 164 (1994) (federal right of privacy protects against governmental disclosure of city employees' Social Security numbers); *State ex rel. McCleary v. Roberts*, 88 Ohio St.3d 365, 725 N.E.2d 1144 (2000) (federal right of privacy prevents disclosure of personal information of children kept by city recreation department).

{¶ 14} Officers have a fundamental constitutional interest in preventing the release of private information when disclosure would create a substantial risk of serious bodily harm, and possibly even death, "from a perceived likely threat," so any such disclosure by the state should be measured under strict scrutiny. *Kallstrom v. Columbus*, 136 F.3d 1055, 1064 (6th Cir.1998) ("*Kallstrom I*"). And "[w]here state action infringes upon a fundamental right, such action will be upheld under the substantive due process component of the Fourteenth Amendment only where the governmental action furthers a compelling state interest, and is narrowly drawn to further that state interest." *Id.*

{¶ 15} In *Kallstrom I*, three undercover Columbus police officers who had testified at the drug-conspiracy trial of members of the Short North Posse, a violent Columbus gang, brought a 42 U.S.C. 1983 action against the city. The officers alleged that the city had violated their constitutional right to privacy by disseminating information from their personnel files, including their addresses, phone numbers, and driver's licenses, and the names, addresses, and phone numbers of their immediate family members to defense counsel for the gang members who were being tried. Counsel then appeared to have passed on the information to the defendants. The city had also released one police officer's personnel file to the Police Officers for Equal Rights organization.

{¶ 16} After the federal district court ruled that the officers had no general constitutional right of privacy that shielded them from the city's release of their personal information, the Sixth Circuit Court of Appeals reversed. The court of appeals held that because this disclosure "placed the officers and their families at substantial risk of serious bodily harm, the prior release of this information encroached upon their fundamental rights to privacy and personal security under the Due Process Clause of the Fourteenth Amendment." Because the city did not establish that "its prior actions narrowly served a compelling state interest, its release of this personal information to defense counsel in the [criminal] case unconstitutionally denied the officers a fundamental liberty interest." *Id.* at 1069-1070.

{¶ 17} We relied on *Kallstrom I* to hold that a federal public defender was not entitled to a writ of mandamus to compel the disclosure of personal information in a police officer's personnel records, because the information was protected by the constitutional right of privacy. *State ex rel. Keller v. Cox*, 85 Ohio St.3d 279, 282, 707 N.E.2d 931 (1999).

{¶ 18} Both *Kallstrom I* and *Keller* were cited by the court of appeals to hold that the requested identifying information of the two wounded officers in the September 2010 shooting at JD's Honky Tonk bar was exempted from disclosure under R.C. 149.43 by the constitutional right of privacy. The Enquirer argues that the court of appeals erred for several reasons: it failed to focus on the threat posed by the requesting party, it did not properly apply the federal district court's decision on remand following *Kallstrom I*, the records that were requested do not contain sensitive information, and the former police chief failed to demonstrate that any real threat existed to the wounded officers. For the following reasons, the Enquirer's arguments lack merit.

{¶ 19} First, with respect to release to the Enquirer, as the Sixth Circuit in *Kallstrom I* observed when the city had disclosed information in that case, the district court had determined that

> although there was no indication that the Police Officers for Equal Rights organization posed any threat to the officers and their family members, disclosure even to that group of the officers' phone numbers, addresses, and driver's licenses, and their family members' names, addresses and phone numbers "increases the risk that the information will fall into the wrong hands."

*Id.*, 136 F.3d at 1064. The Enquirer's reliance on a subsequent case to suggest otherwise is misplaced because there the corrections officers' names and general whereabouts were already known to the prisoners requesting information. *Barber v. Overton*, 496 F.3d 449, 456 (6th Cir.2007). That is not the case here, and furthermore, in both *Kallstrom I* and *Keller*, although defense attorneys rather than the criminal defendants had requested the information, neither case focused on the threat posed by the attorneys themselves. We have cited *Kallstrom I* for the proposition that the mere fact that the requesting party did not pose a threat did not require disclosure of the personal information sought. *McCleary*, 88 Ohio St.3d at 371, 725 N.E.2d 1144 ("disclosure of personal information, even to a benevolent organization posing no apparent threat to the safety of the officers or their families, increases the risk that the information will fall into the wrong hands. [*Kallstrom I*] 136 F.3d at 1064").

{¶ 20} Second, the court of appeals correctly determined that the federal district court's decision on remand from the Sixth Circuit Court of Appeals decision in *Kallstrom I* did not require that it order the disclosure of the requested identifying information of the wounded officers to the Enquirer. *Kallstrom v. Columbus*, 165

F.Supp.2d 686 (S.D.Ohio 2001) ("*Kallstrom II*"). In *Kallstrom II*, the federal district court noted that on remand, the plaintiffs "failed to provide any potentially admissible evidence to suggest that the release of any information contained in the three personnel files may place any of the plaintiffs at any risk of serious bodily harm," "[n]or have they identified a current 'perceived likely threat.' " *Id.* at 695. By contrast, the evidence here, including those portions sealed by the court of appeals, included credible evidence of a perceived likely threat that the Iron Horsemen motorcycle gang would retaliate against the wounded officers for killing the gang's national enforcer. This was supported by Streicher's historical knowledge of the circumstances, past instances of threats made by the Iron Horsemen against the Cincinnati police, and the confidential information confirming the threat against the officers. Further, there is no evidence in the record here—unlike the record in *Kallstrom II*—that the police chief and the city treated the Enquirer differently from other members of the public who could have requested the same information about the wounded officers. *Compare Kallstrom II* at 697-699. Although the Enquirer relies on an alleged statement made by Streicher's counsel in a memorandum in opposition to the complaint, the police chief argues that another statement in that same document proved otherwise, and that document is not included in the record on appeal.

{¶ 21} Third, there is no evidence to support the Enquirer's contention that "by redacting the officers' names, Chief Streicher has blocked any meaningful review of * * * information" relating to discipline and citizen complaints of the wounded officers. Rather, as the court of appeals noted, "[t]he parties' counsel agreed at oral argument that all the requested documents had been disclosed, except that the officers' identities had been redacted." 2011-Ohio-4498 at ¶ 32. Therefore, information contained in the wounded police officers' requested personnel files relating to discipline and citizen complaints has already been made available to the Enquirer.

{¶ 22} Finally, as previously noted, the evidence established that the release of the identities of the wounded police officers would place them at risk of serious bodily harm and possibly even death from a perceived likely threat and that the disclosure of their identities was not narrowly tailored to achieve the public purpose of examining the performance of the police. The sealed portions of Streicher's deposition relating to confidential information confirming the existence of threatened retaliation against the wounded officers were admissible to establish his perception of the threat.

{¶ 23} Therefore, the court of appeals correctly held that the requested names of the wounded police officers were protected from disclosure under R.C. 149.43(A)(1)(v) by the constitutional right of privacy.

### R.C. 149.43(B)(9) Journalist Exception

{¶ 24} The Enquirer next argues that it was entitled to the requested names of the wounded officers because of the exception known as the journalist exception, which allows journalists to obtain certain records relating to peace officers, including their home addresses, even if other members of the public would not be entitled to them. R.C. 149.43(B)(9). But the Enquirer conceded in the court of appeals that it was not entitled to the home addresses of the wounded officers, *see State ex rel. Dispatch Printing Co. v. Johnson*, 106 Ohio St.3d 160, 2005-Ohio-4384, 833 N.E.2d 274, syllabus, and *State ex rel. DeGroot v. Tilsley*, 128 Ohio St.3d 311, 2011-Ohio-231, 943 N.E.2d 1018, ¶ 8, and as the court of appeals held, any rights that the Enquirer has under R.C. 149.43(B)(9) cannot prevail over the officers' constitutional right of privacy. 2011-Ohio-4498, ¶ 23; *see also State ex rel. Painter v. Brunner*, 128 Ohio St.3d 17, 2011-Ohio-35, 941 N.E.2d 782, ¶ 46, quoting the Supremacy Clause of the United States Constitution.

### Attorney Fees

{¶ 25} Finally, because the Enquirer's public-records claim lacked merit, the court of appeals correctly denied its request for attorney fees. *See State ex rel.*

*Dawson v. Bloom-Carroll Local School Dist.*, 131 Ohio St.3d 10, 2011-Ohio-6009, 959 N.E.2d 524, ¶ 34.

### Conclusion

{¶ 26} In summary, the court of appeals did not err in denying the Enquirer's request for extraordinary relief in mandamus and attorney fees. The requested identifying information of the police officers wounded in the September 2010 shooting was exempted from disclosure under the Public Records Act by the constitutional right of privacy. We affirm the judgment of the court of appeals.

Judgment affirmed.

O'CONNOR, C.J., and PFEIFER, LUNDBERG STRATTON, O'DONNELL, LANZINGER, CUPP, and MCGEE BROWN, JJ., concur.

_____

Graydon, Head & Ritchey, L.L.P., and John C. Greiner, for appellant.

John P. Curp, Cincinnati City Solicitor, and Peter J. Stackpole, Assistant City Solicitor, for appellee.

_____