THE STATE EX REL. QUOLKE, APPELLEE, *v.* STRONGSVILLE CITY
SCHOOL DISTRICT BOARD OF EDUCATION ET AL., APPELLANTS.

[Cite as *State ex rel. Quolke v. Strongsville City School Dist.
Bd. of Edn.,* 142 Ohio St.3d 509, 2015-Ohio-1083.]

(No. 2013–1809—Submitted August 19, 2014—Decided March 25, 2015.)

_____

**Per Curiam.**

{¶ 1} This is an appeal of a judgment in an action seeking public records brought by appellee, David Quolke, president of the Cleveland Teachers Union, against appellants, Strongsville City School District Board of Education, its superintendent, the board president, and the board treasurer (collectively, "the board"). Quolke requested the release of the names and identification numbers of all teachers and substitute teachers ("replacement teachers") employed by the

board during a teachers' strike. The board asserted that releasing the names of those teachers would violate their privacy and put them in danger from striking teachers and their supporters. The court of appeals found for Quolke and ordered the board to produce the names.

{¶ 2} The board has presented little evidence that there is any threat to the teachers' privacy or well-being now that the strike is over. We affirm.

Facts

{¶ 3} The board operates a preschool and ten elementary and secondary public schools in its district, serving over 6,200 students. The board employs approximately 385 teachers and other licensed personnel. The teachers are represented by the Strongsville Education Association ("SEA") for collective bargaining of the terms and conditions of employment. Quolke is the president of the Cleveland Teachers Union.

### The strike and associated incidents

{¶ 4} On February 21, 2013, SEA gave the board ten days' notice under R.C. 4117.14(D) that it would strike at 12:00 a.m. on Monday, March 4, 2013. On March 4, SEA commenced its labor strike.

{¶ 5} The day before the strike, the board began hiring temporary replacement teachers to take the place of the striking SEA teachers. The board used the city of Strongsville's council chambers to conduct background checks, collect paperwork, and otherwise process applications for employment of replacement teachers. On March 3, a crowd of 75 to 100 people outside the city-council building chanted, jeered, and cursed at the applicants as they entered and exited the building to apply for jobs. The crowd took pictures of applicants and screamed obscenities at one applicant who entered the building with her two small children.

{¶ 6} Many applicants were visibly shaking when they entered the building. Others were in tears and afraid to leave. Eventually, school administrators began leading applicants to their cars through a rear entrance with a police escort. Some applicants never returned. Several media outlets reported on the crowd's actions.

{¶ 7} During the strike, acts of harassment and intimidation aimed at the replacement teachers continued. Replacement teachers discovered notes left in classrooms containing offensive messages. Signs were distributed in neighborhoods where some replacement teachers lived identifying the teacher by name and disclosing his or her address. SEA posted a "wall of shame" on its website with the pictures of some replacement teachers; the posting was accompanied by derogatory and offensive comments. Picketers continued to harass and intimidate replacement teachers during the strike.

{¶ 8} It was reported that a striking teacher was arrested by the Strongsville Police Department for reckless driving when he allegedly cut off a van transporting replacement teachers to work. The replacement teachers reported to the police that the other driver nearly caused a collision with the van. The replacement teachers described the incident as "harrowing" and "outrageous" and stated that they "feared the worst" and were "frightened."

{¶ 9} A replacement teacher reported to the police that she was driving home after work when a car pulled up next to her and the passenger yelled "scab" and threw an object at her windshield, breaking the glass.

{¶ 10} The strike ended April 28, 2013.

**The public-records request**

{¶ 11} On March 5, 2013, and again on March 20, 2013, attorneys Susannah Muskovitz and William Froehlich, at Quolke's direction, made public-records requests of the board. Specifically, they requested the names, home addresses, home-telephone numbers, cell-phone numbers, employee-identification numbers, and payroll information for all replacement teachers employed by the board from the date the strike began until the date of the request.

{¶ 12} On April 3, 2013, after the board indicated that it would respond but did not do so, Quolke sued in mandamus in the Eighth District Court of Appeals for the records.

{¶ 13} On April 4, 2013, before it had been served with the lawsuit, the board provided copies of some responsive records, but claimed that many of the requested records were not subject to disclosure. In particular, the board asserted that the names of the replacement teachers were not considered public records because of the threat of harm to those teachers.

{¶ 14} Quolke amended his complaint in the public-records case, eventually narrowing the question to whether the names of all teachers employed by the board between March 4, 2013, and the request were public records.

{¶ 15} The court of appeals determined first that Quolke had standing to sue, even though he had not personally made the public-records request but had done so through his counsel. The court also determined that the board was required to disclose the names of the replacement teachers because there was insufficient evidence regarding the threat of harm after the strike had ended on April 28, 2013. The court stated that it issued the writ "taking into consideration the facts and circumstances" as they existed at the time the opinion was rendered. 8th Dist. Cuyahoga No. 99733 (Aug. 21, 2013). The court specifically stated that it was not resolving "the issue whether the constitutional right of privacy and personal safety" could prohibit the release of the names during a strike. The

court denied Quolke's request for statutory damages, but it ordered further evidence and briefing regarding attorney fees.

{¶ 16} On October 7, 2013, the court issued a final journal entry and opinion awarding Quolke $7,972.50 in attorney fees and costs. 2013-Ohio-4481, 2013 WL 5594445. The court of appeals rejected the argument that Quolke was not entitled to fees because he had failed to demonstrate that he was personally responsible for paying the fees.

{¶ 17} The board appealed and requests that this court reverse the judgment and hold that Quolke lacked standing to bring the action, that the names of the replacement teachers are not a public record, and that Quolke is not entitled to attorney fees.

## Analysis

### Public records

{¶ 18} "Mandamus is the appropriate remedy to compel compliance with R.C. 149.43, Ohio's Public Records Act." *State ex rel. Physicians Commt. for Responsible Medicine v. Ohio State Univ. Bd. of Trustees*, 108 Ohio St.3d 288, 2006-Ohio-903, 843 N.E.2d 174, ¶ 6; R.C. 149.43(C)(1). Thus, mandamus is the appropriate remedy for Quolke to obtain access to a public record.

{¶ 19} Although "[w]e construe the Public Records Act liberally in favor of broad access and resolve any doubt in favor of disclosure of public records," *State ex rel. Rocker v. Guernsey Cty. Sheriff's Office*, 126 Ohio St.3d 224, 2010-Ohio-3288, 932 N.E.2d 327, ¶ 6, the relator must still establish entitlement to the requested extraordinary relief by clear and convincing evidence, *State ex rel. Doner v. Zody*, 130 Ohio St.3d 446, 2011-Ohio-6117, 958 N.E.2d 1235, paragraph three of the syllabus.

{¶ 20} To be entitled to a writ of mandamus, Quolke must establish a clear legal right to the requested relief and a clear legal duty on the part of the board to provide it. *State ex rel. Am. Civ. Liberties Union of Ohio, Inc. v. Cuyahoga Cty. Bd. of Commrs.*, 128 Ohio St.3d 256, 2011-Ohio-625, 943 N.E.2d 553, ¶ 22, citing *State ex rel. Brown v. Lemmerman*, 124 Ohio St.3d 296, 2010-Ohio-137, 921 N.E.2d 1049, ¶ 9.

### Standing

{¶ 21} In its first proposition of law, the board argues, as it did below, that Quolke lacks standing to bring this case because his attorneys did not inform the board that they were making the public-records request on his behalf. The board argues that R.C. 149.43(C)(1) allows only "the person allegedly aggrieved" to commence a mandamus action for public records and that Quolke cannot be the "person allegedly aggrieved." However, the board does not assert that Quolke

was not the real requester, just that they were not informed that Quolke, and not the law firm, was the actual requestor of the documents.

{¶ 22} Just because the board did not initially know Quolke was the requestor does not mean he is not the "person aggrieved." Our opinion in *State ex rel. Steckman v. Jackson*, 70 Ohio St.3d 420, 639 N.E.2d 83 (1994), contradicts the board's argument. In that case, we examined the definition of a "person" under R.C. 149.43 and concluded that the definition is broad and permits anyone to obtain records under the Public Records Act. We concluded that "if the records sought are, in fact, public and not subject to any exception as to their release, then whether or not a person is acting as a designee is not an issue." *Id.* at 427.

{¶ 23} We reiterated in *Rhodes v. New Philadelphia*, 129 Ohio St.3d 304, 2011-Ohio-3279, 951 N.E.2d 782, ¶ 20, that "a public office is obligated to honor a records request by 'any person' and that a person does not have to explain his or her reasons for wanting to inspect and copy a public record in order to validly request the record." The concept is codified in R.C. 149.43(B)(4), which states that unless it is otherwise specifically permitted by law, "no public office or person responsible for public records may limit or condition the availability of public records by requiring disclosure of the requester's identity or the intended use of the requested public record."

{¶ 24} Therefore, the identity of the original requester, as well as his reason for requesting the records, is irrelevant, and Quolke is an "aggrieved person" even though he made his original requests through counsel. He has standing to sue, and we affirm the court of appeals on that issue.

**Release of the teachers' names**

{¶ 25} In its second proposition of law, the board argues that it properly withheld the names of the replacement teachers under R.C. 149.43(A)(1)(v), which allows the withholding of records "the release of which is prohibited by state or federal law," to protect the replacement teachers' privacy and well-being. The case law does establish a right to privacy in circumstances in which a person might be at substantial risk of serious bodily harm if personal information is disclosed. *State ex rel. Cincinnati Enquirer v. Craig*, 132 Ohio St.3d 68, 2012-Ohio-1999, 969 N.E.2d 243, ¶ 14 (officers who were targeted by gang members as the result of a shootout had a fundamental constitutional interest in preventing the release of private information when disclosure would create a substantial risk of serious bodily harm and even death); *State ex rel. Keller v. Cox*, 85 Ohio St.3d 279, 282, 707 N.E.2d 931 (1999) ("good sense" rule prevents release of files containing police officers' personal information to a criminal defendant who might use the information for "nefarious ends"); *State ex rel. McCleary v. Roberts*, 88 Ohio St.3d 365, 371–372, 725 N.E.2d 1144 (2000) (photo-identification database of

children attending city swimming pools is not a public record partly because the release of the children's private information to the public increases the risk of harm to the children).

{¶ 26} Some cases also indicate that even when imminent bodily harm is not threatened or is not a potential risk, disclosure is nevertheless precluded because of the potential for nonphysical harm. *See, e.g., State ex rel. Beacon Journal Publishing Co. v. Akron,* 70 Ohio St.3d 605, 609–610, 640 N.E.2d 164 (1994) (social security numbers of government employees are exempt because of the harm that can be inflicted by the disclosure of the number to unscrupulous individuals).

{¶ 27} During the strike, the replacement teachers were primarily subjected to nonphysical threats, such as jeering and obscenities when they arrived to apply for the jobs, nasty notes left in classrooms, and the distribution of "scab" leaflets. However, there were also a few reports of incidents that threatened the physical safety of replacement teachers, such as the reckless-driving incident when a van carrying replacement teachers was cut off on the road and the incident in which an object was thrown through the windshield of a replacement teacher's car. There may have been a genuine threat to the replacement teachers' physical well-being from supporters of the strike.

{¶ 28} Thus, during the strike, the board reasonably concluded that disclosure of the names and other personal information about the replacement teachers would expose them to a substantial risk of serious harm.

{¶ 29} However, in general, a court is to consider the facts and circumstances existing at the time that it makes its determination on a writ of mandamus, not at some earlier time. *State ex rel. Pressley v. Indus. Comm.,* 11 Ohio St.2d 141, 162, 228 N.E.2d 631 (1967).[1]

{¶ 30} The board points out that one of the threats against the replacement teachers was that their decision to work during the strike would "follow them throughout their careers." However, the court of appeals granted the writ specifically because the board had presented little or no evidence that once the strike was over, there was any remaining threat to the replacement teachers. That decision was issued "taking into consideration the facts and circumstances as they exist[ed] * * *, several months after the strike." 8th Dist. Cuyahoga No. 099733, ¶ 12 (Aug. 21, 2013).

---

1. This principle is not absolute. For example, when a mandamus action involves the review of an administrative agency's discretion, the decision to issue the writ must be made based on the facts before the agency at the time it made its original decision. *State ex rel. Portage Lakes Edn. Assn., OEA/NEA v. State Emp. Relations Bd.,* 95 Ohio St.3d 533, 2002-Ohio-2839, 769 N.E.2d 853, ¶ 55.

{¶ 31} The court of appeals did not abuse its discretion by holding that the danger of retaliation or physical harm to the replacement teachers had receded *at the time that it made its decision* and that the board is now obligated to produce the relevant documents with the teachers' names unredacted. We therefore affirm the court of appeals on this issue.

### Attorney fees

{¶ 32} The board argues in its third proposition of law that the court of appeals erred in awarding Quolke attorney fees because he has not shown that he is personally responsible for paying those fees. The board points to cases in which this court and lower courts have denied fees on this basis, but those cases are inapposite.

{¶ 33} Quolke was represented by an independent law firm. Unlike in *State ex rel. O'Shea & Assocs. Co., L.P.A. v. Cuyahoga Metro. Hous. Auth.*, 131 Ohio St.3d 149, 2012-Ohio-115, 962 N.E.2d 297, ¶ 45, he was not an employee or partner in the firm. Unlike in *State ex rel. Beacon Journal Publishing Co. v. Akron*, 104 Ohio St.3d 399, 2004-Ohio-6557, 819 N.E.2d 1087, ¶ 62, he was not represented by in-house counsel. And unlike in *State ex rel. Besser v. Ohio State Univ.*, 87 Ohio St.3d 535, 542, 721 N.E.2d 1044 (2000), he was not represented by a relative.

{¶ 34} The board argues that because Quolke is the president of the teachers' union, it is really the union, not Quolke, who is obligated to pay the fees, and therefore he should not be awarded fees. This argument is also without merit for at least two reasons. First, evidence shows that he *is* a client of a law firm; the time sheet and other statements submitted by counsel refer to the client as Quolke, not the union. And second, even if Quolke is a front or designee for the union, *someone* is obligated to pay the attorney fees, unlike in *O'Shea*, *Beacon Journal*, or *Besser*. Counsel here is an independent law firm, and therefore Quolke is entitled to request fees when appropriate. We affirm on this issue also.

Judgment affirmed.

O'CONNOR, C.J., and PFEIFER, KENNEDY, FRENCH, and O'NEILL, JJ., concur.

O'DONNELL and LANZINGER, JJ., dissent.

———————

### O'DONNELL, J., dissenting.

{¶ 35} Respectfully, I dissent.

{¶ 36} In my view, the court of appeals abused its discretion in granting a writ of mandamus compelling the Strongsville City School District Board of Education to release the names of the replacement teachers to David Quolke because the evidence demonstrates that during the strike, the replacement teachers faced a substantial risk of serious bodily harm from the release of their names, and the

board could not have disclosed their identities during or in the months following the strike without violating their constitutional privacy rights. *Compare State ex rel. Cincinnati Enquirer v. Craig*, 132 Ohio St.3d 68, 2012-Ohio-1999, 969 N.E.2d 243, ¶ 14, 22–23 (holding that R.C. 149.43(A)(1)(v) excepted from disclosure the names of officers when the disclosure would violate constitutional privacy rights by placing the officers at a substantial risk of serious bodily harm and was not narrowly tailored to further a compelling state interest). In addition, the passage of a few months after the settlement of the strike without incident does not permit the inference that the risk of disclosing the replacement teachers' names has diminished, nor does a decision based on a lack of new incidents adequately consider the animosity that picketers and others displayed toward the replacement teachers during the strike.

### History of the Request

{¶ 37} On February 21, 2013, the Strongsville Education Association ("SEA") notified the board that it would commence a labor strike on March 4, 2013. On March 3, 2013, as the board began to hire replacement teachers, picketers jeered, cursed, and photographed those who applied for positions as replacement teachers.

{¶ 38} During the strike, picketers screamed at replacement teachers as they entered and exited district property. At one school, picketers frequently surrounded vans transporting the replacement teachers and yelled at those inside. Some replacement teachers discovered notes in their classrooms with messages like "scabs aren't qualified teachers," "teachers have class, scabs don't," and "how dare you take my job?" The SEA posted a "Wall of Shame" on the Internet that contained pictures of some replacement teachers, comments referring to them as "scabs," and one comment stating, "They don't even realize how this is gonna follow them for their entire career."

{¶ 39} During the strike, someone distributed flyers in the neighborhood of some replacement teachers that disclosed the replacement teachers' names and addresses and identified them as scabs. An unknown individual purportedly followed two vans transporting replacement teachers to a hotel, and the vans had slashed tires the next morning. A striking teacher allegedly cut off a van transporting replacement teachers and nearly caused a collision. In addition, a replacement teacher reported that while she drove home from work one day, someone yelled "scab" and threw an object at her vehicle, damaging her windshield.

{¶ 40} On March 5 and again on March 20, 2013, at Quolke's request, attorneys Susannah Muskovitz and William Froehlich made public records requests of the board for the release of names, home addresses, and other information relating to the identity of the replacement teachers, along with their payroll information.

{¶ 41} Although the board indicated that it was considering those requests, Quolke filed this action in the Eighth District Court of Appeals on April 3, 2013, seeking an order to release the names, employee identification numbers, and payroll information of the replacement teachers. The next day, the board provided the requested payroll information but redacted the names of the replacement teachers along with other personal identifying information.

{¶ 42} The strike ended on April 28, 2013, when the board and SEA certified a successor collective bargaining agreement. Subsequently, Quolke amended his complaint to seek only the names of the replacement teachers. The appellate court granted the writ and ordered the board to release the names to Quolke because it had failed to establish that threats and acts against the replacement teachers continued after the strike ended.

{¶ 43} The board now appeals the issuance of the writ.

### Exceptions to Disclosure

{¶ 44} The Public Records Act excepts from disclosure "[r]ecords the release of which is prohibited by state or federal law." R.C. 149.43(A)(1)(v). "Exceptions to disclosure under the Public Records Act are strictly construed against the public-records custodian, and the custodian has the burden to establish the applicability of an exception." *State ex rel. Miller v. Ohio State Hwy. Patrol,* 136 Ohio St.3d 350, 2013-Ohio-3720, 995 N.E.2d 1175, ¶ 23. "A custodian does not meet this burden if it has not proven that the requested records fall squarely within the exception." *Id.*

### Analysis

{¶ 45} The board has demonstrated that the replacement teachers' names are excepted from disclosure under R.C. 149.43(A)(1)(v), because release of the names is prohibited by state or federal law.

{¶ 46} Constitutional privacy rights meet that qualification pursuant to R.C. 149.43(A)(1)(v). *See Craig,* 132 Ohio St.3d 68, 2012-Ohio-1999, 969 N.E.2d 243, at ¶ 13. Thus, because constitutional privacy rights prohibit the release of the replacement teachers' names, R.C. 149.43(A)(1)(v) excepts them from disclosure.

{¶ 47} In *Craig,* we considered whether Cincinnati's police chief had a duty to disclose the names of officers wounded in a shootout with an outlaw motorcycle gang that resulted in the death of the gang's national enforcer. *Id.* at ¶ 1, 4. There, the Cincinnati Enquirer requested the officers' names, their personnel files, a copy of the incident report, and other records related to the shootout. *Id.* at ¶ 6. The police chief disclosed the requested documents but redacted the identities of officers. *Id.* at ¶ 21. Shortly after the shootout, the police chief had received information that the gang members would target police, particularly the

officers involved in the shootout, and that the threat of retaliation could last indefinitely. *Id.* at ¶ 5.

{¶ 48} The First District denied the Enquirer's request for a writ of mandamus compelling disclosure of the names. *State ex rel. Cincinnati Enquirer v. Streicher,* 1st Dist. Hamilton No. C–100820, 2011-Ohio-4498, 2011 WL 3962999. In affirming, we held that "[o]fficers have a fundamental constitutional interest in preventing the release of private information when disclosure would create a substantial risk of serious bodily harm, and possibly even death, 'from a perceived likely threat,' so any such disclosure by the state should be measured under strict scrutiny." *Craig* at ¶ 14, quoting *Kallstrom v. Columbus,* 136 F.3d 1055, 1064 (6th Cir.1998). We stated that " '[w]here state action infringes upon a fundamental right, such action will be upheld under the substantive due process component of the Fourteenth Amendment only where the governmental action furthers a compelling state interest, and is narrowly drawn to further that state interest.' " *Id.,* quoting *Kallstrom* at 1064.

{¶ 49} We concluded that credible evidence of a perceived likely threat that the gang would retaliate against the wounded officers existed in that confidential information confirmed the threat against the officers, the gang had a history of threatening police, and the police chief had historical knowledge about the retaliatory behavior of outlaw motorcycle gangs. *Id.* at ¶ 5, 20. In addition, we held that disclosure of the identities "was not narrowly tailored to achieve the public purpose of examining the performance of the police." *Id.* at ¶ 22. The record did not support the Enquirer's contention that redacting the names blocked meaningful review of information relating to discipline of and citizen complaints regarding the wounded officers. *Id.* at ¶ 21. The Enquirer had received information on discipline and complaints in the redacted personnel files. *Id.* We concluded that the wounded officers' constitutional privacy rights prohibited disclosure of their names. *Id.* at ¶ 23.

{¶ 50} Teachers have no less of an interest than police officers in preventing the release of private information when disclosure would create a substantial risk of serious bodily harm from a perceived likely threat. As the Sixth Circuit has stated, "[i]ndividuals have 'a clearly established right under the substantive component of the Due Process Clause to *personal security* and to *bodily integrity,*' and this right is fundamental where 'the magnitude of the liberty deprivation that [the] abuse inflicts upon the victim * * * strips the very essence of personhood.' " (Emphasis added.) *Kallstrom* at 1062–1063, quoting *Doe v. Claiborne Cty.,* 103 F.3d 495, 506–507 (6th Cir.1996). "[W]here the release of private information places an individual at *substantial risk of serious bodily harm, possibly even death,* from a perceived likely threat, the 'magnitude of the

liberty deprivation * * * strips the very essence of personhood.'" (Emphasis added.) *Id.* at 1064, quoting *Doe* at 506–507.

{¶ 51} The evidence here shows that disclosure of the names would violate the replacement teachers' constitutional privacy rights—both during and after the strike. During the strike, picketers verbally intimidated the replacement teachers at schools, and the intimidation continued on the Internet, on the roads, and in the community. The allegedly erratic driving of a striking teacher almost caused an accident that could have seriously injured or killed replacement teachers. And the life of another replacement teacher was endangered by an object thrown at her vehicle while driving that damaged her windshield. Thus, in contrast to the facts in *Craig,* the replacement teachers faced more than just a likely threat of retaliation—they actually became victims of retaliatory attacks.

{¶ 52} The majority agrees that during the strike, the board reasonably concluded that disclosure of the names would expose the replacement teachers to a substantial risk of serious harm, but concludes that the appellate court did not abuse its discretion in holding the danger had receded at the time it issued the writ. The court of appeals reached its holding based on the board's failure to produce evidence of new threats made against the replacement teachers after the strike. The majority agrees that the board presented "little evidence that there is any threat to the teachers' privacy or well-being now that the strike is over." Majority opinion at ¶ 2.

{¶ 53} In focusing solely on the passage of time without a documented incident, neither the majority nor the court of appeals gave due consideration to the demonstrated animosity picketers and others exhibited towards the replacement teachers and the fact that once the strike ended, it became harder to locate the replacement teachers without their names or personal information, making the occurrence of new incidents less likely. *See generally Chicago Tribune Co. v. Natl. Labor Relations Bd.,* 79 F.3d 604, 608 (7th Cir.1996) (In deciding whether an employer's post-strike refusal to give a union the addresses of replacement employees hired during the strike constituted an unfair labor practice, stating "[a] rule that focuses solely on the amount of time that has passed since a documented incident of violence fails to take into account the nature of the animosity that exists between former strikers and their replacements").

{¶ 54} The evidence here demonstrates that a decision allowing the disclosure of names of the replacement teachers fails to take into account the nature of the animosity that exists between the former strikers and their replacements and may expose the replacement teachers to a substantial risk of serious bodily harm that could last indefinitely, violating their right to personal security and bodily integrity.

{¶ 55} In addition, disclosure of the replacement teachers' identities is not narrowly tailored to further a compelling state interest. The purpose of the Public Records Act " 'is to expose government activity to public scrutiny.' " *State ex rel. Dispatch Printing Co. v. Johnson,* 106 Ohio St.3d 160, 2005-Ohio-4384, 833 N.E.2d 274, ¶ 27, quoting *State ex rel. Cincinnati Enquirer v. Winkler,* 101 Ohio St.3d 382, 2004-Ohio-1581, 805 N.E.2d 1094, ¶ 5. It is not apparent that without the replacement teachers' names, the public could not conduct a meaningful review of the school district's activities.

{¶ 56} For these reasons, in my view, the appellate court abused its discretion when it granted the writ of mandamus, and I would therefore reverse its judgment.

## Conclusion

{¶ 57} The appellate court abused its discretion in granting a writ to order release of the names of replacement teachers because during the strike the evidence demonstrated that they faced a substantial risk of serious bodily harm and the disclosure now violates their constitutional privacy rights and is not narrowly tailored to further a compelling state interest.

{¶ 58} In addition, the passage of a few months after the strike does not permit the inference that the risks of disclosure have diminished nor does a lack of new incidents adequately consider the nature of the animosity that existed between the former strikers and the replacement teachers.

LANZINGER, J., concurs in the foregoing opinion.

———

Muskovitz & Lemmerbrock, L.L.C., Susannah Muskovitz, and William E. Froehlich, for appellee.

Pepple & Waggoner, Ltd., Christian M. Williams, and Jacqueline T. Walsh, for appellants.

The Gittes Law Group, Frederick M. Gittes, and Jeffrey P. Vardaro, urging affirmance for amicus curiae Ohio Employment Lawyers Association.

Baker & Hostetler, L.L.P., and David L. Marburger, urging affirmance for amicus curiae Ohio Coalition for Open Government.