[Cite as *Gannett GP Media, Inc. v. Ohio Dept. of Pub. Safety*, 2017-Ohio-4247.]

| | |
|---|---|
| GANNETT GP MEDIA, INC., D/B/A, THE CINCINNATI ENQUIRER<br><br>Requester<br><br>v.<br><br>OHIO DEPARTMENT OF PUBLIC SAFETY<br><br>Respondent | Case No. 2017-00051-PQ<br><br>Special Master Jeffery W. Clark<br><br>REPORT AND RECOMMENDATION |

{¶1} Ohio is a party state to the interstate Emergency Management Assistance Compact (EMAC). R.C. 5502.40. The EMAC facilitates mutual assistance between compact states to manage any emergency or disaster that is duly declared by the governor of an affected state. The authorized representative of a party state requests assistance by contacting the authorized representative of another party state. Requests must provide the following information:

> (i) A description of the emergency service function for which assistance is needed, such as but not limited to * * *, law enforcement, * * *.
> (ii) The amount and type of personnel, equipment, materials and supplies needed, and a reasonable estimate of the length of time they will be needed.
> (iii) The specific place and time for staging of the assisting party's response and a point of contact at that location.

*Id.* Article III(B). R.C. 5502.40 contains no language prohibiting disclosure of any assistance records. EMAC requests, agreements, and billing are made using standardized forms, including the multi-section "REQ-A" request form. A sample blank REQ-A form (Excel file, sections separated into 8 sheets) can be viewed at: http://www.floridadisaster.org/Response/Operations/EMAC/documents/EMAC%20REQ-A%20Form%2012-2011.xlsx. *See also* http://www.emacweb.org/ for EMAC overview, processes, and forms (both pages accessed April 13, 2017.)

{¶2} In the fall of 2016, the North Dakota Emergency Management Agency requested, and the Ohio State Highway Patrol (OSHP) agreed to provide, assistance in responding to protests over the Dakota Access Pipeline (DAPL) under construction near the Sioux Tribe Native American Reservation. Ex. A, ¶ 7-9. This agreement was memorialized by the parties through completion of an EMAC REQ-A form.

{¶3} The Ohio State Highway Patrol is a division of respondent Ohio Department of Public Safety (DPS). On November 3, 2016, an employee of requester Gannett GP Media d/b/a The Cincinnati Enquirer (GP Media), made a public records request to DPS for the following:

1. A list of the names and ranks of the 37 Ohio troopers sent to North Dakota via an agreement with the Emergency Managemet [sic] Assistance Compact (EMAC).
2. Any and all communication issued or received by any employee of the Ohio State Highway Patrol, regarding the deployment of these officers.
3. Any document that outlines the agreement between the EMAC and the OSHP regarding the action of sending the 37 troopers.
4. Any OSHP bylaws or procedures which govern agreements with EMAC.

{¶4} On November 23, 2016, P.R. Casey, IV, Associate Legal Counsel and Public Records Manager for DPS, responded to each numbered request as summarized below:

1. Records withheld based on the Security Records exception, R.C. 149.433(A)(1) & (2)(a), and the Fourteenth Amendment protected privacy interest in officers' personal security and bodily integrity,
2. Request denied as overly broad, but DPS encloses 39 pages of responsive records from a previous, more specific request, subject to redactions under R.C. 149.433(A)(1) & (2)(a),
3. Records withheld on the same basis as request #1,
4. DPS has no public records responsive to this request.

{¶5} On November 29, 2016, John Greiner, legal counsel for GP Media, sent a letter disputing Casey's November 23, 2016 responses as to requests numbered 1, 2, and 3. On December 2, 2016, Casey replied to Greiner's concerns, and added to his previous response to Request No. 2 the following:

"DPS does not keep its email records organized in such a manner as to allow for a successful search based on the overly broad terms provided. Fulfillment of your request would require our office to scrutinize and analyze every email for any records containing information responsive to your request. * * * Please be aware however, my offer from the November 23 letter to work with your client to narrow the terms of the overly broad search, remains unchanged."

In a letter dated December 22, 2016, Greiner responded to the December 2, 2016 letter, disputing in further detail the grounds given by DPS for its denials. On January 11, 2017, Casey responded by affirming his previous responses, and reiterating that, "I remain ready and willing to work with you or your client to discuss ways to find actual records. Again, please feel free to contact me at your earliest convenience to discuss request #2 in more detail."

{¶6} On January 17, 2017, GP Media filed a complaint under R.C. 2743.75 alleging denial of access to public records in violation of R.C. 149.43(B). GP Media attached copies of the original records request, and the above-referenced correspondence with DPS. On February 14, 2017, mediation was conducted with a representative of GP Media and representatives of DPS. On February 17, 2017, the court was notified that the case was not resolved and that mediation was terminated. On March 6, 2017, DPS filed its response pursuant to R.C. 2743.75(E)(2). DPS attached the affidavits of OSHP Lieutenant Colonel Kevin Teaford; North Dakota (N.D.) Criminal Intelligence Analyst Cody Larson; Bismarck, North Dakota Police Department Lieutenant Jason Stugelmeyer; and a printout of a PowerPoint presentation used by Larson to document and train on the practice of online "doxing." On March 8, 2017, the court ordered DPS to submit, under seal, an unredacted copy of the withheld records, which DPS states are all contained in the REQ-A completed by North Dakota and Ohio, and invited an affidavit explaining DPS application of a claimed exception to each part of the withheld records.

{¶7} R.C.149.43(C) provides that a person allegedly aggrieved by a violation of division (B) of that section may either commence a mandamus action, or file a complaint

under R.C. 2743.75. In mandamus actions alleging violations of R.C. 149.43(B), a relator must establish by "clear and convincing evidence" that they are entitled to relief. *State ex rel. Miller v. Ohio State Hwy. Patrol,* 136 Ohio St.3d 350, 2013-Ohio-3720, ¶ 14. As for actions under R.C. 2743.75 alleging violations of R.C. 149.43(B), neither party has suggested that another standard should apply, nor is another standard prescribed by statute. R.C. 2743.75(F)(1) states that such claims are to be determined through "the ordinary application of statutory law and case law * * *." Accordingly, the merits of this claim shall be determined under a standard of clear and convincing evidence, i.e., "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶8} For the reasons stated below, the special master concludes that the request for all communication to or from all OSHP employees regarding the 2016 deployment was properly denied as ambiguous and overly broad, but that DPS improperly denied GP Media's requests for the names of Troopers and documents outlining the assistance agreement when it withheld responsive records in their entirety, instead of redacting only items within the records that were exempt from disclosure.

### Request No. 2: All Communication by Any OSHP Employee Regarding Deployment

{¶9} To demonstrate a denial of access to public records in violation of R.C. 149.43(B), an allegedly aggrieved person must show that they have made a proper request for reasonably identified public records. "'[I]t is the responsibility of the person who wishes to inspect and/or copy records to identify with reasonable clarity the records at issue.' * * * " *State ex rel. Morgan v. New Lexington*, 112 Ohio St.3d 33, 2006-Ohio-6365, ¶ 29. Determination of whether such requests are proper or improper is based on

the facts and circumstances of each case. *State ex rel. Zidonis v. Columbus State Comm. College,* 133 Ohio St.3d 122, 2012-Ohio-4228, ¶ 26; *State ex rel. O'Shea & Assocs. Co., L.P.A. v. Cuyahoga Metro. Hous. Auth.*, 131 Ohio St.3d 149, 2012-Ohio-115, ¶ 21.

{¶10} An ambiguous request for research rather than specific records undermines the legitimate interests of both the public office and the requester. A request to find *all* communications "regarding" a topic, to or from any employee, anywhere in the office, requires a needle-in-the-haystack search through the office's paper and electronic communications. It also requires judgment calls as to whether any given communication – whether personal, tenuous, or duplicative – is "regarding" the topic. If a public office attempts such a universal search, the time involved results in delay for the requester. Nor can a public office assume that agreeing to "do the best it can" with an ambiguous or overly broad request, instead of denying it, will shield it from liability. *See State ex rel. Bott Law Group, LLC v. Ohio Dep't of Natural Res.*, 10th Dist. Franklin No. 12AP-448, 2013-Ohio-5219. The dilemma for the public office may not be whether the public office can identify *any* records responsive to the request, but whether the terms of the request permit it to reasonably identify *all* responsive records. Request No. 2 poses a potentially impossible task to respond fully to its ambiguous and overly broad terms.

{¶11} Ohio's public records statutory and case law incentivize requesters and public offices to cooperate in clarifying ambiguous and overly broad requests, with the goal of finding the specific records that the requester seeks while minimizing the burden on the public office. First, R.C. 149.43(B)(2) shields public offices by permitting them to deny such a request, subject to revision:

> (B)(2) * * * If a requester makes an ambiguous or overly broad request or has difficulty in making a request for copies or inspection of public records under this section such that the public office or the person responsible for the requested public record cannot reasonably identify what public records are being requested, the public office or the person responsible for the requested public record may

deny the request but shall provide the requester with an opportunity to revise the request by informing the requester of the manner in which records are maintained by the public office and accessed in the ordinary course of the public office's or person's duties.

In *State ex rel. Shaughnessy v. Cleveland*, Slip Opinion No. 2016-Ohio-8447, ¶ 10, the Supreme Court cited examples of unreasonable requests to conduct research rather than identifying the records sought:

> "The Public Records Act does not compel a public office 'to do research or to identify records containing selected information.' *See State ex rel. Fant v. Tober*, 8th Dist. Cuyahoga No. 63737, 1993 Ohio App. LEXIS 2591, 1993 WL 173743, *1 (Apr. 28, 1993), *aff'd*, 68 Ohio St.3d 117, 1993 Ohio 154, 623 N.E.2d 1202 (1993). *See also Morgan*, 121 Ohio St.3d 600, 2009-Ohio-1901, 906 N.E.2d 1105, at ¶ 14-15 (request for "[a]ny and all email communications * * * which reference * * * the 'evidence-based model' or education funding in general" was overbroad) (first ellipsis sic); *State ex rel. Thomas v. Ohio State Univ.*, 71 Ohio St.3d 245, 246, 1994 Ohio 261, 643 N.E.2d 126 (1994) (noting denial of writ of mandamus where request for records sought selected information 'regarding or related to' any pro-animal-rights action group or individual), citing *Fant.*"

The request found improper in *Shaughnessy* required research through seven days of police incident reports to identify only those reports containing injuries of interest to the requester. *Id.*; *accord State ex rel. Daugherty v. Mohr*, 10th Dist. Franklin No. 11AP-5, 2011-Ohio-6453, ¶ 32-35 ("all * * * policies, emails, or memos regarding whether prison officials are authorized to 'triple cell' inmates into segregation"); *State ex rel. Dillery v. Icsman*, 92 Ohio St.3d 312, 314, 750 N.E.2d 156 (2001) (request for "any and all records generated * * * containing any reference whatsoever to Kelly Dillery"); *State ex rel. Glasgow v. Jones*, 119 Ohio St.3d 391, 2008-Ohio-4788, ¶ 16-19 (request for any and all email sent or received for six months by one official); *Zidonis, supra*, ¶¶ 4, 28-32 (request for all email between two employees where the office did not maintain email records so that they could be retrieved based on sender and recipient status); *but see State ex rel. Carr v. London Corr. Inst.*, 144 Ohio St.3d 211, 2015-Ohio-2363, ¶ 25-29 (request for email between one person and one department for two months found not

overly broad).  A request for communications is also ambiguous or overly broad when it identifies correspondents only as belonging to titles, groups or categories, for which research is required to establish a correspondent's membership.  *State ex rel. Oriana House, Inc. v. Montgomery*, 10th Dist. Franklin Nos. 04AP-492, 04AP-504, 2005-Ohio-3377, ¶ 9, *overturned on other grounds,* 2005-Ohio-6763.

{¶12} GP Media requested "[a]ny and all communication issued or received by any employee of the Ohio State Highway Patrol, regarding the deployment of these officers."  This request falls squarely within the above case citations of ambiguous or overly broad requests.  The request is not limited to a mission file, or to communications during a fixed time with North Dakota authorities.  Instead, the request compels DPS to perform a search through all communications – internal and external, paper and electronic – "issued or received by any employee of the Ohio State Highway Patrol." The request gives no time frame, and does not describe OSHP records as they are maintained and accessed.  The research topic of desired communications is, "regarding the deployment of these officers," an ambiguous phrase that could encompass anything from the deployment agreement (which GP Media did separately and specifically request) to personal communications with family, press releases, or tangential mention in remotely related records, with no clear limit.  Without revision, the request fails to enable DPS to identify all potentially responsive records, and only responsive records, in a search through OSHP's universe of communications.  *Oriana House, Id.*; *Shaughnessy* ¶ 10*,* citing *Thomas.*  I conclude that Request No. 2 was improperly ambiguous, overly broad, and requested a search or research rather than reasonably identifying the records sought.

{¶13} After an office has denied a request that is ambiguous, overly broad, or otherwise does not reasonably identify the records requested, it is then required to "provide the requester with an opportunity to revise the request by informing the requester of the manner in which records are maintained by the public office and

accessed in the ordinary course of the public office's or person's duties." R.C. 149.43(B)(2). The statute does not require the office to provide a comprehensive records maintenance tutorial, or to rewrite the requester's request for them, but the office should convey some relevant information to support revision of the request. Options include, but are not limited to, offering to discuss revision with the requester, *Morgan v. Strickland, supra,* ¶ 14-20; *Zidonis* ¶ 40; *Bott, supra,* ¶ 52, a written explanation of how records are maintained and accessed, and providing the requester with a copy of the office's records retention schedule. *Zidonis* ¶ 33-41. A requester's demonstrated ability to craft proper requests in the past, or the requester's preexisting knowledge of the responding office's records practices, can show that the requester already possesses information necessary to revise and narrow a request. *Id.* A public office's voluntary effort to provide some responsive records, notwithstanding denial of the request, is considered favorably in evaluating its response to an ambiguous or overly broad request. *Id.*; *Morgan v. Strickland*, ¶¶ 6, 14.

{¶14} After DPS exercised its right to deny Request No. 2 as ambiguous and overly broad, it invited GP Media to revise the request, and repeatedly offered to discuss the request to help GP Media clarify the records sought. DPS advised that it did not have the capability to search department email using the terms given in Request No. 2. (Casey letter of December 2, 2016.) DPS voluntarily provided GP Media with 39 pages of records previously produced to a different requester in response to a narrower request. (Compl. Attachments, pp. 5-43.) DPS's quotation of this narrower request provided an example to GP Media of reasonable identification of email records, and the court takes notice that requester was assisted in correspondence by experienced public records legal counsel. I conclude that DPS sufficiently met its obligation to provide GP Media with the opportunity and information to revise this request.

{¶15} GP Media has failed to show by clear and convincing evidence that Request No. 2 was a proper request that reasonably identified the records sought. I

therefore recommend that GP Media's claim of denial of access with respect to Request No. 2 be DENIED. The parties retain the ability to continue negotiating their respective interests in obtaining and providing any records that GP Media seeks. In their correspondence, DPS offered to discuss narrowing the request and ways to find actual records. GP Media responded that it welcomed the opportunity to discuss the matter in more detail. Such discussions are favored by the courts, and could profitably include DPS referring GP Media to online records retention schedules relevant to the request, and GP Media narrowing the request with this and other information provided through discussion,[1] *Nat'l Fedn. of the Blind of Ohio v. Ohio Rehab. Servs. Comm'n*, 10th Dist. Franklin No. 09AP-1177, 2010-Ohio-3384, ¶ 39. The parties are encouraged to cooperate going forward to achieve a mutually acceptable resolution of their interests.

### Exceptions Asserted By DPS

{¶16} In asserting exceptions to an otherwise proper public records request, a public office bears the burden of proof:

> Exceptions to disclosure under the Public Records Act, R.C. 149.43, are strictly construed against the public-records custodian, and the custodian has the burden to establish the applicability of an exception. * * * A custodian does not meet this burden if it has not proven that the requested records fall squarely within the exception.

*State ex rel. Cincinnati Enquirer v. Jones-Kelley*, 118 Ohio St.3d 81, 2008-Ohio-1770, 886 N.E.2d 206, ¶ 10. "If a public record contains information that is exempt from the duty to permit public inspection or to copy the public record, the public office or the person responsible for the public record shall make available all of the information within the public record that is not exempt." R.C. 149.43(B)(1); *State ex rel. Rocker v. Guernsey Cty. Sheriff's Office*, 126 Ohio St.3d 224, 2010-Ohio-3288, ¶ 8-15; *State ex*

---

[1] DPS did not direct GP Media to relevant record series titles, although OSHP records retention schedules are available to the public online: http://apps.das.ohio.gov/rims/Search/PublicSearch.asp. DPS agency code = DHS, and OSHP division code = OSHP. Accessed April 18, 2017.

*rel. Cincinnati Enquirer v. Ohio Dept. of Pub. Safety*, Slip Opinion No. 2016-Ohio-7987, ¶ 49-50. Where a public office claims an exception based on risks that are not evident within the records themselves, the office must provide more than conclusory statements in affidavits to support that claim. *State ex rel. Besser v. Ohio State Univ.*, 89 Ohio St.3d 396, 400-404, 732 N.E.2d 373 (2000). More than bare allegations in an affidavit are necessary to meet the government's burden to show that a record would disclose information that would endanger the life or physical safety of law enforcement personnel, crime victims, witnesses or confidential information sources (under analogous R.C. 149.43(A)(2)(d)). *State ex rel. Nelson v. Cleveland P.D.*, 8th Dist. Cuyahoga No. 62558, 1992 Ohio App. LEXIS 4134, *5-7; *State ex rel. Jenkins v. Cleveland*, 82 Ohio App.3d 770, 785, 613 N.E.2d 652 (8th Dist.1992).

{¶17} DPS does not dispute that Requests Nos. 1 (Trooper names and rank) and 3 (documentation of agreement to deploy) were proper requests for records documenting official functions of the OSHP. DPS denied these requests by stating that all responsive records were "security records" excepted from public disclosure. DPS additionally responded that release of the names/ranks and EMAC Agreement would violate the Troopers' 14th Amendment right to privacy. Requests Nos. 1 and 3 will be analyzed based on each exception asserted. However, the REQ-A submitted under seal does not contain the rank of any Trooper listed therein and therefore disclosure of rank will not be included in the analysis of these requests.

**Request No. 1:  Names of Troopers**
**Fourteenth Amendment Right to Privacy**

{¶18} DPS asserts that the Troopers' names are excepted from release because disclosure would violate their constitutional right of privacy under the Fourteenth Amendment. Upon careful review, the evidence in this case supports the privacy exception only to the extent of withholding the Troopers' names during deployment. The evidence does not justify the continuing use of the exception following the Troopers' return to Ohio.

{¶19} Law enforcement officers have a fundamental constitutional interest in preventing the release of private information when disclosure would create a substantial risk of serious bodily harm or death from a perceived likely threat. *Kallstrom v. Columbus*, 136 F.3d 1055, 1064 (6th Cir.1998) (*Kallstrom I*).  Any such disclosure by the state should be measured under strict scrutiny. Where state action infringes upon a fundamental right, such action will be upheld under the substantive due process component of the Fourteenth Amendment only where the governmental action furthers a compelling state interest, and is narrowly drawn to further that state interest. *Id.*; *State ex rel. Enquirer v. Craig*, 132 Ohio St.3d 68, 2012-Ohio-1999, ¶ 14.  The fact that the requesting party does not pose a threat is irrelevant to a public office's allegation that released information "may fall into the wrong hands." *Id.* ¶ 19.  Records found to be protected under the Fourteenth Amendment privacy right are "[r]ecords the release of which is prohibited by state or federal law," and therefore excepted from the definition of "public record" by R.C. 149.43(A)(1)(v). *Id.* ¶ 13.

{¶20} OSHP Lieutenant Colonel Teaford received pre-deployment reports of threats to North Dakota and other-state law enforcement personnel assisting with the DAPL protest response.  He related briefing by the OSHP Intelligence Unit of incidents and threats of assault and vandalism at the North Dakota site against some officers and equipment.  (Ex. A ¶¶ 14-20, 22, 27, 33; *see also* Ex. B ¶ 3-9 and attached slides.)  While this evidence established that law enforcement officers were exposed to a risk of physical harm while in contact with protesters, no evidence is presented that a Trooper was more likely to be physically attacked, or be exposed to greater physical harm, simply because their *name* was known to a person facing them at the site.  However, Lieutenant Colonel Teaford further stated that he had been informed that Pipeline protesters or their supporters engaged in "doxing" some law enforcement officers serving at the DAPL site.  "Doxing" involves posting a known person's identity and other personal information online with the intent to intimidate, harass or cause physical or

financial harm to the persons identified, and to their family members. (Response at pp. 3, 14-15; Ex. A, ¶ 18; Ex. B, ¶ 4, Ex. C ¶ 4-11.) Although much of the text in the slides attached to Ex. B is difficult to read, it appears that the doxing therein relates substantially if not entirely to North Dakota law enforcement personnel. (Ex. B, ¶ 4-9 and attached slides; Ex. C,¶¶ 5, 7-9, 11-12.) DPS does not document any incident where an OSHP Trooper has been doxed, or where other out-of-state law enforcement personnel have been doxed. However, the reports and briefings received by the OSHP in advance of deployment supported a reasonable belief that release of Trooper identities while they were a physical focus of attention for protesters at the DAPL site posed a substantial risk of retaliatory harassment or serious physical harm to Troopers' families, through doxing. (Ex. A ¶ 17-18.) The withholding of names in response to GP Media's November 3, 2016 request, like the removal of name bars from the Troopers' uniforms, (Ex. A ¶ 19.), was designed to reduce that perceived risk.

{¶21} However, once the risk of physical harm or non-physical retaliation has receded, a public office may be obligated to produce information previously withheld under the Fourteenth Amendment right of privacy. *State ex rel. Quolke v. Strongsville City School Dist. Bd. of Edn.*, 142 Ohio St.3d 509, 2015-Ohio-1083, ¶ 25-31. *Quolke* upheld a finding that,

> "during the strike, the board reasonably concluded that disclosure of the names and other personal information about the replacement teachers would expose them to substantial risk of serious harm. However, in general, a court is to consider the facts and circumstances existing at the time that it makes its determination on a writ of mandamus, not at some earlier time. *State ex rel. Pressley v. Indus. Comm.*, 11 Ohio St.2d 141, 162, 228 N.E.2d 631 (1967)."

*Id.* ¶ 28-29. The Court affirmed that records showing names and identification numbers of replacement teachers employed during a teachers' strike were no longer exempt from disclosure, where there was no evidence that once the strike was over there was any remaining threat to them. *Id.* ¶ 25-31. An assertion of ongoing or future risk must be supported by relevant evidence specific to that time period. "[W]ithout a clear

development of the factual circumstances that would accompany any future release of personal information * * *, any finding regarding future risk to the personal safety of the officers and their families would be speculative." *Kallstrom I* at 1068. Notably, upon remand from *Kallstrom I* the federal district court found that Officer Kallstrom and her fellow plaintiffs had "failed to provide any potentially admissible evidence to suggest that the release of any information contained in the three personnel files may place any of the plaintiffs at any risk of serious bodily harm. Nor have they identified a current 'perceived likely threat.'" *Kallstrom v. Columbus,* 165 F.Supp.2d 686, 695 (S.D.Ohio 2001) (*Kallstrom II*).

{¶22} Only one case cited by DPS upheld withholding the names of law enforcement officers.[2] The other cases cited fail to support the indefinite withholding of officer personal information based on conclusory assertions of risk. In *State ex rel. Keller v. Cox*, 85 Ohio St.3d 279, 707 N.E.2d 931 (1999), a request identified Detective Paul Reece by name, and sought access to Reece's personnel and internal affairs records. Reece's affidavit stated that the criminal defendant on whose behalf the request was made, and a person the defendant had contacted, had threatened Reece and his wife. Although the Supreme Court found that the affidavit could not be considered for purposes of the dispositive Civ.R. 12(B)(6) motion, it upheld exemption of Reece's personnel file based on *Kallstrom I*, finding that,

> "files that contain the names of the officers' children, spouses, parents, home addresses, telephone numbers, beneficiaries, medical information, and the like should not be available to a defendant who might use the information to achieve nefarious ends."

*Id.* p. 282. *Keller* applied *Kallstrom I* to withhold family and residence information, but not Keller's name. A later federal decision clarified that *Kallstrom I* "did not create a

---

[2] DPS states that *Kallstrom I* and *Keller* both held that "the officer's name" could be withheld. (Response pp. 11,13) However, neither case contains such a holding. DPS elsewhere correctly states that the officer's identity was already known in *Keller* (*Id.* p. 13.), and there is no indication in *Kallstrom I* that officers' names were either withheld, or held by the court to be subject to Fourteenth Amendment privacy.

broad right protecting plaintiffs' personal information.  Rather, *Kallstrom* created a narrowly tailored right, limited to circumstances where the information disclosed was particularly sensitive and the persons to whom it was disclosed were particularly dangerous vis-à-vis the plaintiffs." *Barber v. Overton*, 496 F.3d 449, 456 (6th Cir. 2007) (release of correctional officers' social security numbers and birth dates to an inmate did not violate the officers' due process rights).

{¶23} In the one cited case where law enforcement officers' names were withheld under the constitutional privacy exemption, the circumstances were exceptional. Cincinnati police officers had engaged in a gunfight with an outlaw motorcycle gang, in which the gang's national "enforcer" was killed, and two officers were wounded.  *Craig,* 132 Ohio St.3d 68, 2012-Ohio-1999, ¶¶ 2-4.  The police chief received information that there was a good possibility the gang would target Cincinnati police in retaliation, especially those involved in the gunfight, "and that the threat of retaliation for the death of the national enforcer could last indefinitely."  *Id.* ¶ 5.  The Chief testified that,

> "[B]ased on his 'historic knowledge,' it is not unusual for an outlaw motorcycle gang to seek revenge against the police when one of its members is shot and killed by the police. Both officers who had been wounded had themselves returned fire, and both were concerned that if the Iron Horsemen discovered their identities, the gang would retaliate by attacking them or members of their families."

*Id.*  In the Chief's deposition, filed under seal, he provided "confidential information confirming the existence of threatened retaliation against the wounded officers." *Id.* ¶ 22. The Supreme Court held that the identifying information of the wounded police officers was excepted from disclosure, based on credible evidence of a perceived likely threat that the motorcycle gang would retaliate against the wounded officers for killing the gang's national enforcer. *Id.* ¶ 20-23.  DPS has provided no comparable evidence in this case of violent incidents involving Troopers from which to anticipate individual retaliation; no threat of physical harm or doxing of any individual Ohio Trooper before or since their return; no evidence that earlier, general threats of retaliation could last

indefinitely; and no affidavit from any Trooper in support of nondisclosure of their identity. *State ex rel. Cincinnati Enquirer v. Streicher*, 1st Dist. Hamilton No. C-100820, 2011-Ohio-4498, ¶ 28-30; *Craig* ¶¶ 5, 20.

{¶24} Separate from any alleged future risk of serious bodily harm or death, DPS asserts that "Troopers also have a right to protect themselves against 'doxing' and perceived threats that are not physical in nature." (Response p. 14.) DPS cites *State ex rel. Beacon Journal Publishing Co. v. Akron*, 70 Ohio St.3d 605, 612, 640 N.E.2d 164, which held only that city employees have a constitutional privacy right against unchecked release of their Social Security numbers, due to the risk of identity theft. Notably, other personal information in that case, including "[e]mployees' addresses, telephone numbers, salaries, level of education, and birth dates, among other things, were all provided" without objection from the employees. *Id.* pp. 605, 610-611. The *Quolke* Court considered *Beacon Journal v. Akron,* and threats of nonphysical harm like those that DPS asserts on behalf of the Troopers, but did not find them persuasive. *Quolke* ¶¶ 26-27, 30. Finally, the federal Sixth Circuit has limited the scope of informational privacy rights under the Fourteenth Amendment, and determined that a mere risk that information disclosure could result in identity theft or damage to credit rating does not implicate a *fundamental* constitutional interest. "[I]dentity theft constitutes a serious personal invasion, [but] it simply does not implicate the well-established right to personal security as contemplated by this court in *Kallstrom*." *Lambert v. Hartman*, 517 F.3d 433, 444-445 (6th Cir.2008). No Ohio case has created a general fundamental constitutional interest in the privacy of one's name. *But see State ex rel. McCleary v. Roberts*, 88 Ohio St.3d 365, 372, 725 N.E.2d 1144 (2000) (database of photographs, names, addresses and other personal information of uniquely vulnerable juvenile customers found subject to Fourteenth Amendment privacy right).

{¶25} Ohio does have a robust statutory framework of exceptions for peace officers' and their families' "personal information," but the *names* of peace officers are not protected. To the contrary, the Revised Code expressly requires that every law enforcement agency, as a public office,

> "shall maintain a database or a list that includes the name and date of birth of all public officials and employees elected to or employed by that public office. The database or list is a public record and shall be made available upon a request made pursuant to section 149.43 of the Revised Code."

R.C. 149.434(A). Statutory provisions for confidentiality of peace officer[3] personal information include: R.C. 4501.271 (upon request, the Bureau of Motor Vehicles shall not disclose a peace officer's residence address, or shall provide a business address on his or her driver's license, or both); R.C. 149.45(D) (upon request, public offices other than county auditors must redact the address of the requesting peace officer from any record it makes available to the general public on the internet); R.C. 319.28(B) (upon request, the county auditor must remove the name, and replace it with the initials, of a peace officer from any record made available to the general public on the internet or a publicly accessible database and the general tax list of real and public utility property and the general duplicate of real and public utility property, as the name of the person that appears on the deed); R.C. 2921.24 and 2921.25 (no officer, court or employee of a law enforcement agency shall disclose, without a determination of good cause, the home address of a peace officer who is a witness or arresting officer in a pending criminal case); R.C. 149.43(A)(1)(h) and (A)(2)(d) (exception for records pertaining to a particular law enforcement matter, the release of which would create a high probability of endangering the life or physical safety of law enforcement personnel). In addition, R.C. 149.43(A)(1)(p) and (A)(7) exempt release of a peace officer's personal residence address, social security and banking numbers, benefit information, and similar

---

[3] Each of the statutes cited in this paragraph uses or creates a definition of "peace officer" that includes OSHP Troopers.

information regarding the peace officer's family members, as well as photographs of peace officers who may engage in undercover assignments.  Of these exceptions, only R.C. 149.43(A)(2)(d) implies authority to withhold a peace officer's name, under specific circumstances within a law enforcement investigation.  By enumerating public records exceptions for specific peace officer information, the General Assembly has already weighed and balanced the competing public policy considerations between the public's right to know that information generally, and the potential harm, inconvenience or burden imposed on the agency by disclosure.  *State ex rel. James v. Ohio State Univ.*, 70 Ohio St.3d 168, 172, 637 NE.2d 911 (1994).  *Compare State ex rel. Vindicator v. Wolff*, 132 Ohio St.3d 481, 2012-Ohio-3328, ¶ 32-37 (alternative access to the same records, and other protections for the rights sought to be defended, counter plaintiffs' demand for restricted access to records under Sup.R. 45(E)).  Thus, while officers' residential and familial records have specific protections, statutory and constitutional law are far more restrained when it comes to concealing the *names* of law enforcement officers.

{¶26} The policy underlying the Public Records Act is that "open government serves the public interest and our democratic system." *State ex rel. Dann v. Taft*, 109 Ohio St.3d 364, 2006-Ohio-1825, 848 N.E.2d 472, ¶ 20. "[O]ne of the salutary purposes of the Public Records Law is to ensure accountability of government to those being governed." *State ex rel. Strothers v. Wertheim*, 80 Ohio St.3d 155, 158, 684 N.E.2d 1239, 1242 (1997).  Therefore, R.C. 149.43 must be construed "liberally in favor of broad access, and any doubt is resolved in favor of disclosure of public records." *State ex rel. Cincinnati Enquirer v. Hamilton Cty.*, 75 Ohio St.3d 374, 376, 662 N.E.2d 334 (1996).  Exceptions to disclosure must be strictly construed. *State ex rel. Thomas v. Ohio State Univ.*, 71 Ohio St.3d 245, 247, 643 N.E.2d 126 (1994).  This applies to any exception, including the constitutional right to personal security and bodily integrity. Social workers, patrol officers, strikebreaking employees, judicial officers, prosecutors,

health and zoning inspectors, politicians, corrections officers, and scores of other public employees can be subject to harassment and threats of serious physical harm in the course of their duties, yet their names are available to the public. As the federal district court concluded in releasing information regarding the *Kallstrom* officers: "The Court appreciates the need to protect the health and safety of law enforcement officials and their families. But the health and safety of this democracy depend on a press that can function without additional burdens being imposed based on its ability to publish information concerning government activities." *Kallstrom v. Columbus*, 165 F. Supp. 2d 686, 703 (S.D. Ohio 2001).

{¶27} The risk that was perceived during deployment has now receded. DPS presents no evidence of retaliatory pursuit of the Troopers or their families. At the present remove in time and distance from the North Dakota protesters, DPS has not provided the required "clear development of the factual circumstances that would accompany any future release" of the Troopers' names. *Kallstrom I,* p. 1068. The bare allegations of continuing physical risk in the response and in Exhibits A-C are speculative and non-specific. An attenuated and receding risk of online harassment is not the kind of threat that justifies indefinitely concealing the names of law enforcement officers who exercised plenary police power during a public, uniformed mission. Even under strict scrutiny, the evidence does not support a finding that disclosure of the Trooper names would pose a current substantial risk of serious bodily harm or death to the Troopers or their families from any perceived likely threat, and DPS has therefore failed to prove that the Fourteenth Amendment right of privacy applies to the names of the Troopers at the present time.[4]

---

[4] Even had the requisite level of future threat been shown, release would still satisfy the remainder of the constitutional balancing test. The courts assume that the interests served by allowing public access to public records rise to the level of a compelling state interest, *Kallstrom I.* at 1065; *State ex rel. Cincinnati Enquirer v. Streicher*, 1st Dist. Hamilton No. C-100820, 2011-Ohio-4498, ¶ 31. And the request for names and the agreement was narrowly drawn to serve the interest of public access, as it requested none of the residence or family information found problematic in *Kallstrom I.* Unlike the

**Request No. 1:  Names of Troopers**
**Records Directly Used to Protect Against Attack, R.C. 149.433(A)(1)**

**{¶28}** DPS separately asserts that the Troopers' names are excepted from release pursuant to R.C. 149.433(A)(1) and (B)(1):

> (A) As used in this section: * * * 'Security record' means any of the following:
> (1) A record that contains information directly used for protecting or maintaining the security of a public office against attack, interference, or sabotage.
> (B)(1) A record kept by a public office that is a security record is not a public record under section 149.43 of the Revised Code and is not subject to mandatory release or disclosure under that section.

"Public office" as used in the statute includes officials and employees. *State ex rel. Plunderbund Media, L.L.C., v. Born*, 141 Ohio St.3d 422, 2014-Ohio-3679, ¶ 20.

**{¶29}** As detailed in the Fourteenth Amendment analysis, DPS provides no evidence that the Troopers were any more subject to physical attack or sabotage at the DPS site whether protesters knew their names, or did not.  The evidence shows that the predicted risk of "doxing" perceived by the OSHP in advance of and during deployment justified withholding Trooper names to protect them during deployment from the "interference" of threats against their families.  The evidence does not justify the continuing use of this exception following the Troopers' return to Ohio.

**{¶30}** In *Plunderbund*, *supra*, ¶¶ 3-7, 19-31, DPS records of the investigation of direct threats against the governor were found to meet the definition of "security records" in R.C. 149.433(A)(3)(a) – recodified in 2016 as R.C. 149.433(A)(1), 2016 Sub.S.B. No. 321.  However, like the federal court in *Kallstrom I*, the *Plunderbund* Court cautioned DPS specifically, and agencies generally, that the exception must be proven in each case:

> This is not to say that all records involving criminal activity in or near a public building or concerning a public office or official are automatically 'security

---

request in *Craig*, the request for Trooper names was not mitigated by any release of other enlightening mission information from the REQ-A.  *Craig* ¶ 21.

records.'  The department and other agencies of state government cannot simply label a criminal or safety record a "security record" and preclude it from release under the public-records law, without showing that it falls within the definition in R.C. 149.433.

*Id.* ¶29.  Nor should this exception be asserted beyond the person(s) demonstrably at risk, or after the risk has abated.  In *State ex rel. Ohio Republican Party v. FitzGerald*, 145 Ohio St.3d 92, 2015-Ohio-5056, the county withheld as "security records" key-card-swipe data for the one employee against whom verified threats had been received, but released the same data for employees who had not received threats.  *Id.* ¶¶ 6-8, 24. The Court determined that when the threatened employee left his position, the key-card-swipe data were no longer security records, and ordered their release.  *Id.* ¶¶ 27-28, 30.

{¶31} In contrast with the records withheld in *Plunderbund* and *FitzGerald* involving direct threats against particular officials, DPS shows no direct threats made against these Troopers either individually or as a group.   However, for the same reasons discussed in connection with the Fourteenth Amendment Right to Privacy, I find that withholding the names in response to GP Media's November 3, 2016 request, like the removal of name bars from the Troopers' uniforms, was designed to reduce a perceived substantial risk of online harassment including physical threats toward Troopers' families, threatening "interference" with the Troopers' mission.  (Ex. A, ¶¶ 17-19, 29).  The list of names therefore qualified as "security records" during deployment.

{¶32} An initial correct withholding of a record as a security record under R.C. 149.433(A)(1) does not establish the exception in perpetuity.  The courts must take into account that violence, harassment, and online threats associated with a particular event often recede as a function of time and distance.  In the analogous *Quolke* case, the facts justifying withholding the names of replacement teachers *during* a strike included protesters chanting, jeering, and cursing; acts of harassment and intimidation; taking and posting photographs online with derogatory and offensive comments; posting of signs in neighborhoods where some replacement teachers lived identifying them by

name and disclosing their addresses; violence against vehicles, and using vehicles; and threats that consequences would follow replacement teachers "throughout their careers." *Id.* ¶¶ 5-9, 29, 30, However, the Court found that by the time the action was filed:

> "the board had presented little or no evidence that once the strike was over, there was any remaining threat to the replacement teachers. That decision was issued "taking into consideration the facts and circumstances as they exist[ed] * * *, several months after the strike."

*Id.* ¶ 30. Five months have passed since the Troopers' return to Ohio from North Dakota. Further, unlike the replacement teachers in *Quolke*, the Troopers do not reside near the protest site, or work in the same profession as the protesters. Against this separation in time and distance, DPS presents little or no evidence of credible current threats directed against the Troopers or their families. DPS has not shown that actual doxing of Ohio Troopers has occurred, either collectively or individually. The evidence fails to support any continuing or new threat of physical harm following the return of the Troopers to Ohio. The bare allegations of continuing risk are non-specific and speculative, and do not establish withholding of names as "directly * * * protecting or maintaining the security of [these Troopers] against attack, interference, or sabotage." The evidence does not establish that release of the list of names at this time threatens a substantial risk of future physical or even nonphysical harm.

{¶33} I find that during the DAPL deployment DPS officials were permitted[5] to withhold the list of Trooper names pursuant to R.C. 149.433(A)(1), based on reports that law enforcement officers and their families would be targeted for retaliation through

---

[5] The wording of R.C. 149.433(B) ("a security record *is not a public record* under section 149.43") establishes only a discretionary exception to the Public Records Act, and does not *prohibit* release of security records. 2000 Ohio Op. Att'y Gen. No. 021 ("R.C. 149.43 does not expressly prohibit the disclosure of items that are excluded from the definition of public records, but merely provides that their disclosure is not mandated.")

doxing if their identities were known. However, the evidence does not justify the continuing use of the exception to withhold Trooper names following their return to Ohio.

**Request No. 3: EMAC Agreement**
**Fourteenth Amendment Right to Privacy**

{¶34} DPS parenthetically asserts that other identifying information in the EMAC agreement would violate the Troopers' constitutionally-protected privacy rights to personal security and bodily integrity. (Response p. 11.) In support, DPS states that "information such as hourly pay rate that could easily lead to the Trooper's identities * * *." (Response p. 14.) Lieutenant Colonel Teaford suggests how hourly pay rate could be traced to a Trooper's name, and adds the item, "employee ID," as information that could disclose identity. (Ex. A ¶ 27.)

{¶35} Based on the same evidence and reasoning applied to the Troopers' names, I find that the employee ID numbers contained in the EMAC Agreement were subject to withholding under the Fourteenth Amendment right to privacy during the Troopers' deployment to North Dakota, but not at the present time. However, the argument that a person could use a known hourly pay rate to research a particular employee's identity is too attenuated to make pay rate release a "disclosure of identity." Twenty-one of the thirty-seven hourly rates in the REQ-A appear beside more than one name, even before considering their likely duplications with over fifteen hundred other Troopers employed by the OSHP. In the absence of any direct risk shown, disclosure of financial and time records violates neither equal protection nor substantive due process guarantees. *State ex rel. Beacon Journal Publ. Co. v. Bodiker*, 134 Ohio App.3d 415, 429-430, 731 N.E.2d 245 (10th Dist. 1999). I conclude that the Fourteenth Amendment right of privacy did not apply to the Troopers' pay rates listed in the EMAC Agreement at any time during or following deployment.

**Request No. 3: EMAC Agreement**
**Records Directly Used to Protect Against Attack, R.C. 149.433(A)(1)**

**{¶36}** DPS argues that the entire EMAC Agreement meets the definition of "security record" set out in R.C. 149.433(A)(1):

> (1) Any record that contains information directly used for protecting or maintaining the security of a public office against attack, interference, or sabotage;

DPS asserts that the withholding of "deployment plans," "vulnerability assessments," and "tactical response plans" allegedly contained in the form is a direct use to protect or maintain the security of the Troopers. (Response at pp. 8-11.) However, most of the sections in the REQ-A form contain only administrative and billing information. A limited number of records in a few sections do meet the definition of "security records," and may be redacted.

**{¶37}** As noted in the application of this exception to the list of Trooper names, the Supreme Court has cautioned DPS and other agencies of state government that simply labeling records involving criminal activity concerning a public office or official as "security records" is insufficient, without showing that it falls squarely within the definition in R.C. 149.433. *Plunderbund*, *supra*, ¶¶ 19-31. In *State ex rel. Miller v. Pinkney*, Slip Opinion No. 2017-Ohio-1335, a sheriff's office broadly labeled as "security records" all offense and incident reports in which the county executive was identified as a reportee, complainant, or victim. Upon examination *in camera,* the Supreme Court determined that nine withheld reports "are not security records and are subject to release with the redaction of exempt information." *Id.* ¶ 1-4, Appendix. Regarding security of government equipment, *see State ex rel. Data Trace Info. Servs., L.L.C. v. Cuyahoga Cty. Fiscal Officer*, 131 Ohio St.3d 255, 2012-Ohio-753, 963 N.E.2d 1288, ¶ 65 (CDs documenting procedure and operation of recorder's office to make backup copies of instruments recorded are not "security records.").

**{¶38}** DPS alleges that the REQ-A contains the OSHP's entire deployment plan for the North Dakota Pipeline protest. (Response p. 9; Ex. A ¶ 24.) In identifying

"information directly used to protect" the Troopers from attack, interference, and sabotage, DPS refers to "operational tactics used," "future response plans," plans of "an operational response for each day," "a law enforcement response plan to violent protests and criminal acts," "specific and unique vulnerability assessments," and "specific and unique response plans." (Response pp. 3-4, 8-9)   However, upon review of the REQ-A, which was completed and signed prior to deployment, I find that it contains no "plans" in the sense of detailed proposals for operational actions and responses.  Instead, both the response, and the affidavit of Lieutenant Colonel Teaford, show that any such plans were created as part of briefings that took place *after* the REQ-A was completed.  (Response ¶ 3-4.)  For example, in his affidavit, Lieutenant Colonel Teaford warns against release of briefings and updates that occurred during deployment, such as,

> "daily *email briefing* from one of the commanders, which included *updates on North Dakota authorities' written daily intelligence records*.  In my review of *these records*, I can confirm that the documents contained known threats to law enforcement, security vulnerabilities, and tactical response plans for each day." (Ex. A ¶ 20.),

> "One of the commanders also updated me on the previous day's activities, including *the Troopers' tactical responses to violent protests.  These response plans* were unique * * *.  (Ex. A ¶ 21.),

> "*The information from these briefings was used each day* by law enforcement to prepare for the day's protest response * * *." (Ex. A ¶ 22.), and

> "we would * * * likely use the same operational response plans *set forth in the prior daily email briefings.*" (Ex. A ¶ 24.).

These extended references to post-deployment briefings, North Dakota daily intelligence records, the "plans" developed during deployment, as well as any security opinions to the extent that they rely on these references (*e.g.* Ex. A ¶¶ 25, 27-32), are irrelevant in evaluating the actual contents of the REQ-A.

{¶39} In the REQ-A form, only the lists of equipment promised by the OSHP, and prospective disclosure of the staging area, appear to meet the definition of "security record" in R.C. 149.433(A)(1).  The evidence does not establish any direct relationship between withholding the administrative and billing information that constitute the rest of the contents of the REQ-A, and the security of Troopers from attack, interference or sabotage.  Regarding the similarly worded exception for trial preparation records,

> Time sheets and billing records generally can be categorized as "routine office records" that fall outside the definition of "trial preparation records." *See State ex rel. Carpenter v. Tubbs Jones* (1995), 72 Ohio St. 3d 579, 580, 651 N.E.2d 993.

*Bodiker*, *supra* at 427.

{¶40} Based on the above, I find that only the records within the REQ-A regarding equipment and staging area are subject to R.C. 149.433(A)(1), and the remainder are routine administrative and billing records that do not meet the definition of "security records."   Appended to this report is an *Attachment - Recommended Redactions To REQ-A* in which the sections and fields of the EMAC Agreement/REQ-A are listed beside specific recommendations as to what information is subject to withholding under the "security record" exception in R.C. 149.433(A)(1).

{¶41} DPS asserts that the "security record" exemption for these records continues after the Troopers' return, alleging risk to future officers through disclosure of the REQ-A "operational response plans and briefings," and operational tactics used. (Response at p. 10-11.)   However, this exception does not automatically apply in perpetuity, and requires proof of continuing application.  In *Plunderbund*, the records of investigations of threats against the governor were found still to be "security records," regardless of investigation status or the passage of time, but in *Plunderbund,* DPS provided much more detailed testimony connecting the disclosure of that information to future risks to the governor and his successors.  *Plunderbund.* ¶ 24-31.  In *FitzGerald,* documents were found no longer security records once the county executive left office. *Id.* ¶¶ 27-28, 30.  *See Pinkney*, Slip Opinion No. 2017-Ohio-1335, Appendix (documents

appear to contain innocuous information, unfounded threats, and/or were several years old). The evidence in this case supports withholding only the lists of the OSHP equipment promised, based on testimony that the same lists would be used in future similar operations. (Ex. A ¶¶ 13, 29-32.) After deployment and return, the location of the initial staging area in North Dakota is only historical information and no longer meets the definition of a "security record."

{¶42} Applying R.C. 149.43(A)(2)(d), an analogous exception involving officer safety, the Eighth District Court of Appeals found that prospective release of a "strike plan" that would reveal specific procedures, plans and techniques at a time of potential civic unrest "is precisely the kind of 'information that would endanger the life or physical safety of law enforcement personnel * * *." *State ex rel. Cleveland Police Patrolmen's Ass'n v. Cleveland*, 122 Ohio App.3d 696, 699-701 (8th Dist.1997). However, an attempted retrospective application of R.C. 149.43(A)(2)(d) was rebuffed in *Conley v. Corr. Reception Ctr.*, 141 Ohio App.3d 412, 414-416, 751 N.E.2d 528 (4th Dist.2001) where an inmate made a request for work schedules and photographs of corrections officers who had worked in his segregation unit on two past dates, with the purpose of identifying particular officers who he claimed had battered him. The appellate court overruled the trial court's dismissal of the claim, holding that the correctional institution was required to present "an affirmative showing that disclosure would endanger the officer." *Id.* p. 416. The court observed that even granting that the inmate had a motive to attempt to harm his alleged assailants was not enough to establish a high probability of danger as a matter of law, especially since the inmate had been transferred to another institution. The court noted that "[a] different case would be presented if the [inmate]'s request involved future work schedules, or similar information which could be used to discern specific law enforcement tactics or techniques on a given day and location." *Id.* p. 417. The level of proof required by these cases is not present in this case.

{¶43} DPS also asserts that the "security record" portions of the REQ-A may be reused in hypothetical future OSHP deployments to North Dakota or in preparing OSHP requests for assistance, and that disclosing the current REQ-A may put other states at risk by revealing the specific request information from North Dakota.  However, the REQ-A does not contain either operational response plans or briefings, and the affidavits provide only conclusory opinions and factually contradicted assertions.  For example, DPS asserts that dissemination of the REQ-A would threaten the security of out-of-state law enforcement:

> [T]he EMAC agreement in the present case contains information relevant to North Dakota's requests to other participating states. Therefore, some of the information contained within the EMAC agreement protects not just the Ohio Troopers from attack, interference, and sabotage, but all law enforcement who have assisted in North Dakota.

(Response p. 8-9.)  DPS further asserts that withholding the REQ-A directly protects what are expected to be similarly worded requests by Ohio in requests for assistance:

> Should Ohio need to enact the EMAC to request law enforcement assistance to the State, Ohio's request and subsequent EMAC agreement with out-of-state law enforcement agencies would undoubtedly look similar to North Dakota's EMAC agreement here.  [citing Ex. A p. 3]

(Response p. 10.)  DPS argues in effect that release of an EMAC agreement by any compact state poses this risk:

> In the wrong hands the information in the EMAC agreement could be used to thwart law enforcement's efforts to maintain peaceful protests, or to compromise the personal safety of law enforcement personnel, thereby placing these officers in significant danger. [citing Ex. A p.4]

However, multiple law enforcement agencies from at least six states that have assisted North Dakota with the DAPL protests have released redacted or full EMAC requests, agreements and in one case an after-action report in response to public records

requests.[6]  Some of the web sites in footnote 6 are government sites, and the EMAC records reproduced in the remainder must logically be available on the public record of their disclosing agencies to any future requests.  The assertion that Ohio's copy of the REQ-A must be withheld to conceal information because it is common to North Dakota's requests to other states, and to future Ohio requests and agreements, is contradicted when similar or identical information is publicly available from other sources.  "The Supreme Court has found that 'the interests in privacy fade when the information involved already appears on the public record.' *Cox Broad. Corp. v. Cohn, 420 U.S. 469, 494-95, 43 L. Ed. 2d 328, 95 S. Ct. 1029 (1975).*"  *Kallstrom II* p. 695.  *Accord*, *Besser v. Ohio State Univ.*, 89 Ohio St.3d 396, 403, 732 N.E.2d 373 (2000) (email containing information readily ascertainable from other sources is not "trade secret"); *State ex rel. Jenkins v. Cleveland*, 82 Ohio App.3d 770, 785, 613 N.E.2d 652 (8th Dist.1992) (some of the information that would allegedly endanger life or physical safety "is available through other public records").

{¶44} Conclusory allegations of future risk of serious bodily harm are not sufficient alone.  The evidence in this case supports the conclusion that the danger of retaliation or physical harm to the Troopers has receded, and that DPS is now obligated

---

[6] Released with redactions –**Indiana** EMAC Mission Order Authorization Form: https://ia801904.us.archive.org/5/items/IndianaEMACDAPL/Public%20Records%20Request%20EMAC%20DAPL.pdf; **Louisiana** (2 missions: Lafourche and St. Charles) REQ-A: https://archive.org/stream/EMACLADAPL/EMAC-%20Lafourche%20%28Redacted%29#page/n0/mode/2up  http://www.publicrecordmedia.org/wp-content/uploads/2017/MNDPS2016_pd_006.pdf (click "Full text of 'EMAC DAPL Louisana [sic] Agreements,'" or "See other formats."; **Minnesota** Hennepin Co. Sheriff's Office Mission Order Authorization Form:  http://www.publicrecordmedia.org/wp-content/uploads/2017/MNDPS2016_pd_003.pdf; **Minnesota** REQ-A: http://www.publicrecordmedia.org/wp-content/uploads/2017/MNDPS2016_pd_006.pdf; **Minnesota** Anoka County Sheriff's Office Intergovernmental Agreement:  http://www.publicrecordmedia.org/wp-content/uploads/2017/MNDPS2016_pd_008.pdf;  **Nebraska** (3 missions) REQ-As: https://www.muckrock.com/foi/nebraska-300/emac-agreement-and-after-action-reports-regarding-dapl-north-dakota-nebraska-emergency-management-agency-30020/; **Wyoming** (copy of ND request only): https://www.muckrock.com/news/archives/2017/jan/18/north-dakota-emac-request/. Released in entirety - **Wisconsin**: http://www.unicornriot.ninja/?p=11176 (after action report, Intergovernmental Agreement, and EMAC RC-2 form, St. Croix Co. Sheriff's Office. All accessed April 14, 2017.

to disclose the location of the staging area for the 2016 deployment. The other information identified as security records within the REQ-A remains subject to the exception, as noted in the Appendix.

**Request No. 3: EMAC Agreement**
**Records Prepared to Respond to Acts of Terrorism – R.C. 149.433(A)(2)(a)**

{¶45} Separately from R.C. 149.43(A)(1), DPS asserts that the EMAC Agreement is excepted pursuant to R.C. 149.433(A)(2):

> "(A) As used in this section: * * *. 'Security record' means any of the following: (2) Any record assembled, prepared, or maintained by a public office or public body to prevent, mitigate, or respond *to acts of terrorism*, including any of the following: (a) Those portions of records containing specific and unique vulnerability assessments or specific and unique response plans either of which is intended to prevent or mitigate acts of terrorism, and communication codes or deployment plans of law enforcement or emergency response personnel; * * *." (Emphasis added.)

DPS submits no evidence by affidavit or otherwise that Ohio, North Dakota, or Federal authorities have determined that the DAPL protests included acts of terrorism.[7] Lieutenant Colonel Teaford describes the request from North Dakota as one for "law enforcement assistance in responding to protests over the Dakota Access Pipeline (DAPL)," not to prevent, mitigate, or respond to acts of terrorism. In the absence of qualified evidence, the court may not draw an inference that a protest where some participants use violence involves "acts of terrorism."

{¶46} I conclude that because R.C. 149.433(A)(2) applies only to records "assembled, prepared, or maintained by a public office * * * to prevent, mitigate, or respond to *acts of terrorism*," and DPS provides no evidence that it prepared the REQ-A to prevent, mitigate or respond to acts of terrorism, DPS has not met its burden to prove that R.C. 149.433(A)(2) applies to the records at issue.

---

[7] Despite the wording of the link, the article provided at page 14 footnote 3 of DPS' response, http://www.cincinnati.com/story/new/2017/01/10/ohio-officials-calling-standing-rock-protesters-terrorists/96250080/, does not quote any "Ohio officials calling Standing Rock protesters terrorists."

**Request No. 4:  OSHP Bylaws or Procedures**
**No Responsive Records**

{¶47} With respect to Request No. 4, "Any OSHP bylaws or procedures which govern agreements with EMAC," DPS responded on November 23, 2016 that there were no responsive records to this request.  Ex. A ¶¶ 6, 10.  A respondent has no duty to create or provide access to nonexistent records. *State ex rel. Lanham v. Smith*, 112 Ohio St.3d 527, 2007-Ohio-609, ¶ 15.  Based on this evidence, I find that GP Media has not shown a denial of access to any existing records responsive to Request No. 4.

### "Security Records" May Be Redacted from EMAC Agreement

{¶48} DPS argues that the REQ-A may be withheld in its entirety, rather than redacting only those items meeting the definition of "security record."  (Response p. 7-8.)  DPS points to the definition in R.C. 149.433(A)(1) of "[a]ny record *that contain*s information directly used for protecting * * *."  However, the Public Records Act expressly requires that only records falling squarely within an exception may be withheld:

> "If a public record contains information that is exempt from the duty to permit public inspection or to copy the public record, the public office or the person responsible for the public record shall make available all of the information within the public record that is not exempt."

R.C. 149.43(B)(1).  The suggestion that the exception covers an entire 8-page document, no matter how little of it constitutes a "security record,"

> "ignores [Supreme Court] precedent holding that public records can be items, documents, *and items within documents.* See, e.g., *State ex rel. Beacon Journal Publishing Co. v. Akron (1994), 70 Ohio St.3d 605, 606, 1994 Ohio 6, 640 N.E.2d 164* (Social Security numbers found within payroll files were 'records' for purposes of *R.C. 149.011(G)*); *Dupuis, 98 Ohio St.3d 126, 2002 Ohio 7041, 781 N.E.2d 163, P21* (settlement proposal within larger court record is a public record). Moreover, a contrary holding would ignore our precedent that the public records laws should be read broadly and construed liberally to effectuate the intent of the statute. See *State ex rel. Plain Dealer, 80 Ohio St.3d at 518, 687*

> *N.E.2d 661*; *Gannett Satellite Information Network, Inc., 80 Ohio St.3d at 264, 685 N.E.2d 1223*; *Hutson, 70 Ohio St.3d at 623, 640 N.E.2d 174.*"

*Kish v. Akron*, 109 Ohio St.3d 162, 2006-Ohio-1244, footnote 3.

{¶49} Further, an analogous exception for "trial preparation" records is defined using identical language, as "any record *that contains* information that is specifically compiled in reasonable anticipation of [court proceedings]." R.C. 149.43(A)(4). However, not every record that simply *contains* trial preparation records within it may be withheld in its entirety from a public records request:

> "[R]ecords which purportedly contain trial preparation records * * * may be viewed *in camera* by this court to determine which sections may be redacted pursuant to the trial preparation records exception."

*Bodiker*, *supra*, at 428. Public offices have redacted security records from larger records, where appropriate. In *FitzGerald*, 145 Ohio St.3d 92, 2015-Ohio-5056, the county released key-card-swipe data for five employees and withheld only the data for the county executive, *Id.* ¶ 6, rather than labeling the entire key-card-swipe database a "security record" and withholding all six. In *State ex rel. Bardwell v. Cordray*, 181 Ohio App.3d 661, 2009-Ohio-1265 (10th Dist.), ¶¶ 68-70, 78, the Attorney General's Office redacted only a phone number and an email response as security records, from within larger correspondence. *See also* other-state REQ-A redactions in footnote 6. A document that is composed *entirely* of security records, or in which security records are inextricably intertwined with the remainder of the document, may be withheld *in toto*. However, where only discrete and severable items fall squarely within the definition of "security records" and are assembled within a larger document, the Public Records Act and relevant case law require that only the specific security records may be redacted.

### Conclusion

{¶50} Upon consideration of the pleadings and attachments, I find that GP Media has failed to establish by clear and convincing evidence that DPS violated division (B) of R.C. 149.43 when it denied GP Media's Request No. 2 for all communication issued or

received by all employees of the OSHP regarding the deployment of Troopers to North Dakota in 2016. The request was ambiguous, overly broad, and required a search or research instead of reasonably identifying the records sought. Accordingly, I recommend that the court issue an order DENYING GP Media's claim for relief based on Request No. 2.

{¶51} I further find that GP Media has failed to establish by clear and convincing evidence that DPS violated division (B) of R.C. 149.43 when it denied GP Media's Request No. 4 for any OSHP bylaws or procedures which govern agreements with EMAC. DPS presented unrebutted evidence that no records responsive to this request exist. Accordingly, I recommend that the court issue an order DENYING GP Media's claim for relief based on Request No. 4.

{¶52} I further find that GP Media has established by clear and convincing evidence that DPS violated division (B) of R.C. 149.43 when, following their return from deployment, it withheld the names of the 37 Troopers deployed to North Dakota. I further find that GP Media has established by clear and convincing evidence that DPS violated division (B) of R.C. 149.43 when it withheld the EMAC Agreement/REQ-A in its entirety instead of redacting only the portions that meet the definition of "security record" in R.C. 149.433(A)(1). Accordingly, I recommend that the court issue an order GRANTING GP Media's claim for relief based on Request No. 1, and GRANTING IN PART GP Media's claim for relief based on Request No. 3, and which 1) directs the DPS to provide GP Media with a copy of the EMAC Agreement/REQ-A, subject to redaction of items indicated in the ATTACHMENT hereto, and 2) provides that GP Media is entitled to recover from DPS the costs associated with this action, including the twenty-five dollar filing fee. R.C. 2743.75(F)(3)(b).

{¶53} *Pursuant to R.C. 2743.75(F)(2), either party may file a written objection with the clerk of the Court of Claims of Ohio within seven (7) business days after receiving this report and recommendation. Any objection shall be specific and state*

*with particularity all grounds for the objection. A party shall not assign as error on appeal the court's adoption of any factual findings or legal conclusions in this report and recommendation unless a timely objection was filed thereto. R.C. 2743.75(G)(1).*

 

JEFFERY W. CLARK
Special Master

cc.

John C. Greiner
312 Walnut Street, Suite 1800
Cincinnati, Ohio 45202

Morgan A. Linn
1970 West Broad Street, Suite 531
Columbus, Ohio 43223

Heather L. Buchanan
30 East Broad Street, 16th Floor
Columbus, Ohio 43215

**Filed April 24, 2017**
**Sent to S.C. Reporter 6/13/17**

**ATTACHMENT**
**Recommended Redactions To REQ-A**

The sections and fields of the REQ-A form are listed in the left column (*see also* footnote 1). Only fields that have content are listed. In the right column, information is identified as meeting or not meeting the definition of "security record" in R.C. 149.433(A)(1): a "record that contains information directly used for protecting or maintaining the security of a public office against attack, interference, or sabotage."

## SECTION I TO BE COMPLETED BY THE REQUESTING STATE

| | | |
|---|---|---|
| Exercise or Event:<br>Event | New or Amendment #: | These fields do not contain information that meets R.C. 149.433(A)(1) |
| Date | Requesting State | |
| State Mission Tracking #: | EM Software Tracking #: | |
| Requesting Agency: | EMAC Tracking #: | |
| **Requesting State REQ-A Contact** | | These fields do not contain information that meets R.C.149.433(A)(1). Government email addresses used |
| First Name | Last Name | |
| Phone 1: | Phone 2: | |
| Email 1: | Email 2: | |
| **Resource Request**<br>Mission Type/Source:<br>Type/Status:<br>Mission Description:<br>Resource Description:<br># Requested<br># Type | | These fields do not contain information that meets R.C. 149.433(A)(1). Resource Description shows only resources *requested*. No evidence details how withholding this information protects security of officers |
| **Deployment Dates (Including Travel Days)**<br>Deployment Date:<br>Demobilization Date:<br>Duty Length | | These fields do not contain information that meets R.C. 149.433(A)(1) |

| | |
|---|---|
| **Deployment Details**<br>Work Location/Facilities<br>Location/Facility Name<br>Address 1, City, Zip Code<br>Working Conditions<br>  Comments:<br>Living Conditions<br>  Comments:<br>Logistics Comments: | These fields do not contain information that meets R.C. 149.433(A)(1) |
| **Identify Health & Safety Concerns**<br>**(All Selected Apply)**<br>No Safety or Health Concerns have been Identified<br>Immunizations or Vaccinations are suggested to deploy<br>Environmental Hazards Exist<br>Personal Protection Equipment Needed<br>Safety Concerns/Remarks | These fields do not contain information that meets R.C. 149.433(A)(1).  Content of Concerns/Remarks is too general to constitute a "vulnerability assessment." |
| **Requesting State Resource Coordination Contact**<br><table><tr><td>First Name</td><td>Last Name</td></tr><tr><td>Title</td><td>Agency</td></tr><tr><td>Phone 1</td><td>Mobile</td></tr><tr><td>Email 1</td><td>Email 2</td></tr></table> | These fields do not contain information that meets R.C. 149.433(A)(1). Government email addresses used |
| **Staging Area and Point of Contact**<br><table><tr><td>POC First Name</td><td>Last Name</td></tr><tr><td>Phone 1</td><td>Phone 2</td></tr><tr><td>Location/Facility Name</td><td></td></tr><tr><td>Address 1</td><td></td></tr><tr><td>City</td><td>Zip Code</td></tr></table> | Location/Facility Name and Address could assist persons in creating countermeasures, Exhibit A ¶ 29, so is properly withheld before and during deployment.  After return, none of this section contains information that meets R.C. 149.433(A)(1) |
| **EMAC Authorized Signature**<br>Name of EMAC Authorized Representative<br>Signature of EMAC Authorized Representative<br>Date | These fields do not contain information that meets R.C. 149.433(A)(1) |

**SECTION II TO BE COMPLETED BY THE ASSISTING STATE**

| | |
|---|---|
| Assisting State:<br>Assisting Agency: | These fields do not contain information that meets R.C. 149.433(A)(1) |
| **Offer Description**<br><br>Mission Start Date: / Arrival Date:<br>Departure Date: / Mission End Date:<br># Mission Days<br>Mission Type / Type/Status<br>Mission Description<br>Resource Description<br># Requested<br># Type | Ex. A ¶¶ 13, 29-32 states that disclosing equipment to be used could mitigate personal security, both in N.D. and for future similar deployment. Resource Description text lines 25-33 may therefore be withheld. None of the other fields contain information that meets R.C. 149.433(A)(1) |
| **Assisting State REQ-A Contact**<br><br>First Name / Last Name<br>Phone 1: / Phone 2:<br>Email 1: | These fields do not contain information that meets R.C. 149.433(A)(1). Government email address used |
| **Total Mission Estimated Costs**<br>Travel:<br>Personnel:<br>Equipment:<br>Commodities:<br>Other:<br>ESTIMATED TOTAL COST: | These fields do not contain information that meets R.C. 149.433(A)(1) |
| **Travel**<br><br>Personal Vehicle Costs: / Rental Vehicle Costs: / Government. Vehicle Costs:<br>Air Travel Costs: / Meals & Tips (Receipt): / Meals & Tips (Per Diem):<br>Lodging: / Parking Fees: / Shipment & Transportation:<br>Total: | These fields do not contain information that meets R.C. 149.433(A)(1) |

| | |
|---|---|
| **EMAC Authorized Signature**<br>Name of EMAC Authorized Representative<br>Signature of EMAC Authorized Representative<br>Date: | These fields do not contain information that meets R.C. 149.433(A)(1) |
| **Personnel Costs**<br>*These column headings above 37 entry rows*: ID, Name, Reg. Salary Hourly Rate, Fringe Benefit Hourly Rate, Reg. Hours Worked Per Day, OT Salary Hourly Rate, OT Fringe Benefit Hourly Rate, OT Hours Worked Per Day, # Days, Total Daily Cost, Total Mission Cost | These fields do not contain information that meets R.C. 149.433(A)(1).<br><br>*Note*: no officer ranks, phone #'s, or email addresses are entered |
| **Commodity Costs**<br>*These column headings above 4 entry rows*: ID, Commodity Description, Cost Per Item, Quantity, Total Costs | Ex. A ¶¶ 13, 29-32 states that disclosing equipment to be used could mitigate personal security, both in N.D. and for future similar deployment. The Commodity ID and Description columns meet R.C. 149.433(A)(1) |
| **Equipment Costs**<br>*These column headings above 1 entry row*: ID, Equipment Description, Cost Per item, Quantity, # Days Used, Total Cost | Ex. A ¶¶ 13, 29-32 states that disclosing equipment to be used could mitigate personal security, both in N.D. and for future similar deployment. The Equipment ID and Description columns meet R.C. 149.433(A)(1) |
| **Other Costs**<br>*These column headings above 1 entry row*: ID, Other Description, Cost Per Item, Quantity, # Days Used, Total Cost | These fields do not contain information that meets R.C. 149.433(A)(1) |

**SECTION III TO BE COMPLETED BY THE REQUESTING STATE**

| Date<br>Event<br>Mission Description:<br>Req. State Tracking #: | These fields do not contain information that meets R.C. 149.433(A)(1) |
| --- | --- |
| **EMAC Authorized Signature**<br>Name of EMAC Authorized Representative<br>Signature of EMAC Authorized Representative<br>Date | These fields do not contain information that meets R.C. 149.433(A)(1) |